HORACE T. SMITH, ET AL. *v.* PAUL HIGINBOTHOM, ET AL.

[No. 22, Adv. October Term, 1946.]

116

*Per curiam filed June 19, 1946.*

*Decided September 3, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, and GRASON, JJ.

*William Taft Feldman,* with whom were *Laurie H. Riggs* and *Harvey C. Bickel* on the brief, for the appellants.

*Frederick J. Singley* and *Paul R. Kach,* with whom were *Wendell D. Allen* and *Richard W. Emory* on the brief, for the appellees.

*Per curiam:*

For reasons to be stated in an opinion to be filed hereafter, it is ordered by the Court of Appeals this 19th day of June, 1946, that the order appealed from, refusing a preliminary injunction in the above entitled case, be and the same is hereby affirmed, and that the decree appealed from, sustaining the demurrer and dismissing the bill of complaint, be and the same is hereby affirmed with costs to the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

This suit was brought in the Circuit Court of Baltimore City by four members of the Baltimore Bar, Horace T. Smith, Webster C. Tall, James K. Cullen and Wilfred T. McQuaid, seeking a declaratory decree and preliminary injunction against Paul M. Higinbothom, president of the Bar Association of Baltimore City, Charles C. G. Evans, chairman of the Committee for the Nomination and Election of the Sitting Judges, and the Bar Association of Baltimore City, a body corporate.

The bill of complaint, filed on June 7, 1946, alleges that complainants are candidates for Associate Judge of the Supreme Bench of Baltimore City, subject to nomination in the Republican primary election on June 24, and that they possess all the qualifications for that office; but six judges, Michael J. Manley, E. Paul Mason, Herman M. Moser, Charles E. Moylan, Joseph Sherbow and John T. Tucker, appointed by Governor O'Conor to fill vacancies until the general election in November, are also candidates; and a committee appointed by the president of the Bar Association is conducting a newspaper and radio campaign in support of the sitting judges and soliciting contributions to defray the expenses. The bill prays for a decree declaring that any activity of the Bar Association to promote the nomination or election of a candidate for public office is *ultra vires,* and (2) that the activities of defendants in support of the sitting judges violate the Maryland election law. The bill also prays for an order pending decree to restrain defendants from soliciting or expending money in be-

half of the incumbents. Defendants demurred to the bill. On June 11 the Court passed an order denying injunctive relief, and on June 14 passed a decree sustaining the demurrer and dismissing the bill. The appeals are from the order and the decree.

Under the Constitution of Maryland of 1776, the Governor appointed all judges in the State with the consent of the Council. After 1837, when the Council was abolished, the Governor appointed them with the consent of the Senate. Acts of 1836, Ch. 197; Acts of 1837, Ch. 84. In some of the States the judges were appointed by the Governor, in others they were chosen by the Legislature; but the wave of Jacksonian Democracy eventually led to the election of judges by the people. This movement began in Mississippi in 1832. New York and Iowa changed to the elective system in 1846; Illinois, Arkansas and Wisconsin in 1848; California in 1849; Pennsylvania, Virginia, Kentucky, Michigan, Missouri and Alabama in 1850. The Maryland system was changed in 1851, when the members of the Constitutional Convention argued that in most instances the judges had been appointed by the Governor on account of political party, whereas the voters would not consider a candidate's partisanship. 2 Debates, Md. Reform Convention of 1851, 464, 490. The elective system was continued in Maryland under the Constitution of 1864, and also under our present Constitution. Md. Constitution of 1867, Art. IV, Secs. 3, 5; Constitutional Amendment, Acts of 1943, Ch. 772. By this time the majority of the States had changed their Constitutions to provide for popular election of judges, and this method was chosen by all the States admitted into the Union thereafter.

A half century under the elective system revealed that it had a number of disadvantages, and the modern trend has been away from popular control of the judiciary. In Connecticut most of the judges are now appointed by the Governor with the consent of the Legislature. In New Jersey and Delaware nearly all the judges are appointed by the Governor with the consent of the Senate.

In Maine, New Hampshire and Massachusetts most of them are appointed by the Governor with the consent of his Council. In Vermont, Rhode Island, Virginia and South Carolina virtually all are elected by the two Houses of the Legislature in joint session. In recent years the American Bar Association and America Judicature Society have proposed a new method of judicial selection whereby the Governor appoints from a list of nominees suggested by a small commission. In California, first State to adopt the new plan, the Judges of the Supreme Court and of the intermediate appellate courts are appointed by the Governor with the consent of a Commission composed of the Chief Justice or Acting Chief Justice, the Attorney General, and the presiding justice of one of the District Courts of Appeal. Haynes, Selection and Tenure of Judges, 9-50. According to the American Judicature Society, this system, which has also been adopted by Missouri, has been a disappointment because it has not succeeded in removing politics from judicial selection. 28 Journal, American Judicature Society, 91.

However that may be, it has been recognized for many years in Maryland and the other States which still retain the elective system that it is the privilege of the Bar to publish its opinion on the qualifications of judicial candidates. The Bar Association of Baltimore City was incorporated in 1880 to aid in maintaining the honor and dignity of the profession of law, to promote legal science, and to further the administration of justice. The by-laws, in prescribing the procedure by which members of the Bar available for the bench are recommended to the Governor for appointment and to the people for election, require the president of the association to appoint a Judicial Committee of seven members, who investigate the integrity, wisdom, sound legal knowledge and general qualifications of available lawyers, and report their findings and recommendations to the president, who shall thereupon publish such report. The Executive Committee may direct that the proposed names be submitted to a referendum vote of the membership of the association.

The by-laws further provide that the president shall appoint such committees as he may deem necessary for the proper conduct of the business of the association and their duties shall be such as the president may prescribe. It is beyond question that the Bar Association has the power under its charter and by-laws to engage in the alleged activities in support of the sitting judges.

Appellants strongly urged that a contribution toward the expenses of the special committee of the Bar Association may place the sitting judges under obligation to the contributor. Undeniably this objection is one of the disadvantages of the elective system. Nevertheless, it is axiomatic that those who select the judges ought to possess information as to the qualifications of those eligible for choice. Consequently it has been customary for the bar association in many cities of the country to urge the election of qualified judicial candidates in the press and by radio. The Association of the Bar of the City of New York has had an active Judiciary Committee since 1898 to support the candidates considered best fitted for the bench. In 1930 the American Judicature Society reported that notable campaigns against "intolerable conditions" had been conducted by the bar associations in Cleveland, St. Louis and Los Angeles, and in one campaign the Chicago Bar Association had collected and spent more than $75,000 for expenses. 14 Journal, American Judicature Society, 10, 11.

In this State, the sitting judge policy has received public approval for many years on the ground that it is beneficial to the State to elect those who have demonstrated their integrity, wisdom and sound legal knowledge. It does not mean that the sitting judge will always receive the endorsement of the Bar Association. In the New Judges Fight of 1882, out of which the policy grew, the Baltimore *Sun*, which led the fight, published a statement signed by several hundred leading business and professional men opposing three of the four sitting judges, and all four independent candidates were victorious. The historians of The *Sun*, in referring to that

campaign, state: "A non-political judiciary that will interpret fairly the law and administer justice without political taint or touch is more vital to the community than anything else. A good judge is entitled to re-election regardless of his party affiliation; a poor judicial candidate, pushed by the politicians, should never be supported for party reasons. That was the position The *Sun* took in 1882, and from it the paper has never receded an inch." Johnson, Kent, Mencken and Owens, The *Sunpapers of Baltimore*, 144, 145.

Appellants also made the objection that the sitting judge policy amounts in actual practice to a device by which the Governor, who has the power to fill vacancies, is enabled to keep his appointees in office, and hence the influence of the Bar Association circumvents the right of the people to elect their judges. However, the fact that all six of the sitting judges are members of the Governor's political party is a matter over which the Court has no control. The situation was well explained by Chief Justice Taft when he declared before the American Bar Association: "It is true that politics have played a part when judges have been appointed. They have naturally been taken from the lawyers of the prevailing party. The President or a Governor appointing them has been elected on a partisan ticket, is the titular head of his party, and is expected to give preference to those who supported him. This has not, however, resulted in political courts, because the control of the government has naturally changed from one party to another in the course of a generation and has normally brought to the bench judges selected from both parties; and then, if the judges are made independent by the character of their tenure, the continued exercise of the judicial function entirely neutralizes in them any possible partisan tendency arising from the nature of their appointment." 38 Reports, American Bar Association, 423.

We come now to the second question, whether the activities alleged in the bill of complaint violate our election law. The section alleged to be violated declares that it

shall be unlawful and shall be deemed a corrupt practice for any corporation "directly or indirectly, by itself, or through any officer, agent or employe, representative, or other person whatsoever, to give, contribute, furnish, lend or promise any money, property, transportation, means or aid to any political party, or any candidate for public office, or for nomination thereto, or to any political organization, or to any political committee, or to any treasurer or political agent, as herein defined, either directly or indirectly, to aid, promote or influence the success or defeat of any political party or principal, or of any measure or proposition submitted to a vote at a public election or primary election in this State, or to aid, promote or influence in any manner the election or defeat of a candidate therein, or to be used, applied or expended in any way whatever for political purposes." Acts of 1945, Ch. 934, Sec. 157.

It is a cardinal rule of statutory construction that the intention of the Legislature should be sought in the first instance in the words of the statute. Where the language is clear and free from doubt, the Court has no power to evade it by forced and unreasonable construction in order to assert its own ideas of policy or morals. The Court has no right to sit in judgment upon the wisdom of the Legislature or to pass upon the expediency of the law. *Leonard v. Wiseman,* 31 Md. 201, 204; *United States v. Standard Brewery,* 251 U. S. 210, 40 S. Ct. 139, 140, 64 L. Ed. 229. However, as we have stated in *Pittman v. Housing Authority of Baltimore City,* 180 Md. 457, 463, 464, 25 A. 2d 466, the meaning of the plainest words in a statute may be controlled by the context. If a word is fairly susceptible of more than one interpretation, the Court should seek the legislative intention by considering the cause or necessity of the enactment and the mischief it was intended to remedy, and adopt the meaning which will harmonize with the general scheme of the statute and assist in carrying out the legislative purpose. *Hawbecker v. Hawbecker,* 43 Md. 516, 519; *Mitchell v. State,* 115 Md. 360, 80 A. 1020;

*Brenner v. Brenner,* 127 Md. 189, 96 A. 287; *Powell v. State,* 179 Md. 399, 401, 18 A. 2d 587; *Roach v. Jurchak,* 182 Md. 646, 35 A. 2d 817. The real intent, when ascertained, will always prevail over the literal sense of the language, because both the canons of verbal criticism and the rules of grammatical construction must alike yield to the manifest spirit and intent of an enactment. *Roland Park Co. v. State,* 80 Md. 448, 451, 31 A. 298; *City of Baltimore v. Williams,* 129 Md. 290, 99 A. 362; *City of Hagerstown v. Littleton,* 143 Md. 591, 600, 123 A. 140; *Bouse v. Hull,* 168 Md. 1, 4, 176 A. 645; *Bickel v. Nice,* 173 Md. 1, 6, 192 A. 777; *Hopper v. Jones,* 178 Md. 429, 431, 13 A. 2d 621; *State Tax Commission v. Potomac Electric Power Co.,* 182 Md. 111, 32 A. 2d 382; *Maryland Unemployment Compensation Board v. Albrecht,* 183 Md. 87, 94, 36 A. 2d 666; *Celanese Corporation of America v. Davis,* 186 Md. 463, 47 A. 2d 379.

At common law the tendency of the courts was to apply a strict rule of evidence in cases of corruption, and alleged fraud, bribery, coercion or intimidation was required to be established clearly. Attempts to prove corruption were attended with great expense and practical difficulties, and consequently it was only in the most glaring cases that the jurisdiction of the courts was invoked. Efforts to eradicate the corruption of the electorate in England led to the enactment of the Corrupt and Illegal Practices Act of 1883. In the early days of America, when the electoral machinery was not so vast, the use of enormous campaign funds was unknown. With the growth of big business, the political machines each year became more dependent upon the large corporations as a source of revenue to conduct the campaigns, and each year the financial interests exerted a greater influence in political affairs. In most instances the corporations made the contributions, not because of any interest in the welfare of a particular party, but for the purpose of securing special privileges. Occasionally the party machine forced the corporations to pay heavily for rights to which they were already fairly entitled,

but it was considered more expedient to pay than to resort to litigation. New York adopted the first Corrupt Practices Act in the United States in 1890, based on the English Act. Michigan and Colorado adopted similar Acts in 1891, and Massachusetts in 1892. In Maryland the long crusade to stamp out corruption at elections was led by the Baltimore Reform League. In 1901 the Committee on Judicial Administration and Legal Reform of the Maryland State Bar Association reported that corporations had been making political contributions in Maryland without defensible reasons, and often contributed to both political parties at the same time; but it could not conceive of any ordinary circumstances in which a corporation could rightfully contribute toward political campaigns, for even if such contributions were made from proper motives, they might afterwards be made the basis for demands which it would not be for the public interest to grant. The Bar Association, adopting the report of the committee, favored a law imposing upon the directors of any corporation violating it a joint and several liability to refund the amount of such contributions which they may authorize their corporation to make. 6 Reports, Md. State Bar Association, 34, 44, 48. In 1907 the platforms of both political parties contained pledges favoring a stringent Corrupt Practices Act, and in 1908 Governor Crothers urged the Legislature to pass a measure similar to the Corrupt Practices Acts of England, New York and Connecticut. The Governor recommended that the law should require candidates and political committees to publish the amounts of their campaign expenses and all receipts of money for campaign purposes, and the source of the same, and should also prohibit corporations from making contributions for political purposes. The Legislature finally passed the Act, adding fifteen sections to Article 33 of the Code. It was one of these sections which made it unlawful for any corporation to supply "any money, property, transportation, means or aid" for political purposes. Acts of 1908, Ch. 122, Sec. 172.

The power of the Legislature to enact corrupt practices legislation is very broad. It is a fundamental doctrine that all reasonable regulations which the Legislature deems important to guard against corruption and to preserve the purity of elections are not only within the constitutional power of the Legislature but commendable if not absolutely essential. It is held that a statute prohibiting a corporation from contributing to a campaign fund is constitutional. But the intention of the lawmakers was that corporations, as such, should not contribute to campaign funds for the purpose of influencing votes in an election. *State v. Fairbanks,* 187 Ind. 648, 115 N. E. 769, 771. But laws of this kind lie within the domain of the police power and are subject to the same limitations as are laws dealing with the right of life, liberty and property. The right of the Legislature to exercise the police power is not referable to any single provision of the Constitution. It inheres in and springs from the nature of our institutions, and so the limitations upon it are those which spring from the same source as well as those expressly set out in the Constitution. The Legislature at all times exercises a delegated power, and its action is always subject to the test of reasonableness. The sovereign power remains in the people. A full exercise of the right of citizenship includes, not only the right to vote, but the right to assemble, the right of free speech, the right to present one's views to one's own fellow citizens, and the right to submit one's claims to leadership to the people. These rights are of the very essence of democracy. *State ex rel. La Follette v. Kohler,* 200 Wis. 518, 228 N. W. 895, 69 A. L. R. 348. It is clear that the individual activities of the officers of corporations are not prohibited by the Corrupt Practices Act. They may freely speak, write and publish their views. *People v. Gansley,* 191 Mich. 357, 158, N. W. 195, 201.

The punishment prescribed for a violation of Section 172 (now Section 157) is a fine of not more than $5,000 and imprisonment for a term of not more than three

years. This penalty may be imposed upon the president, the directors and every other officer of the corporation which violates it, and also upon the president, director or other officer or agent of the corporation who shall personally violate it. The evident purpose of the Act was to stamp out corruption, and the lawmakers obviously thought that one of the best ways to prevent the excessive use of money was to prohibit corporations from contributing to campaign funds. Certainly the members of the State Bar Association, when they authorized a committee to draft a bill for introduction in the Legislature, never considered that the activities of the City Bar Association were corrupt or that a law was needed to curtail its activities. It is conceded in this case that the Baltimore Bar Association has not made any contribution from its treasury to defray the expenses of the committee's work. The funds for this purpose are donated by individuals, and do not belong to the corporation. The committee's work of disseminating information does not interfere with the purity of elections, and since the corporation has not made any contribution of money or other property there is no violation of Section 157. We hold that the action of an incorporated bar association in expending money to defray the expenses of a bar referendum does not constitute a giving or contributing of money or other aid to a candidate within the meaning of the Act. *La Belle v. Hennepin County Bar Ass'n,* 206 Minn. 290, 288 N. W. 788, 125 A. L. R. 1023. We also hold that a bar association or other non-profit corporation may lawfully collect funds from voluntary contributors to defray the expense of publication and distribution of campaign literature in support of candidates or measures to be voted upon at a public election. *Matter of Woodbury,* 174 App. Div. 569, 160 N. Y. S. 902; *Vannier v. Anti-Saloon League of New York,* 238 N. Y. 457, 144 N. E. 679.

In order to accept the contention of appellants, it would be necessary to give a broad interpretation to the words "means or aid." A narrow construction is per-

missible under the established rule of *ejusdem generis* that where general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned. This rule is based on the supposition that if the Legislature had intended the general words to be considered in an unrestricted sense, it would not have enumerated the particular things. Of course, this is merely a rule of construction to be resorted to as an aid in ascertaining the intended meaning of words only when there is uncertainty; and it cannot be invoked to restrict the meaning of words within narrower limits than the statute intends so as to subvert its obvious purpose. *American Ice Company v. Fitzhugh*, 128 Md. 382, 97 A. 999; *United States Cement Co. v. Copper*, 172 Ind. 599, 88 N. E. 69; *Willis v. St. Paul Sanitation Co.*, 48 Minn. 140, 50 N. W. 1110, 16 L. R. A. 281, 31 Am. St. Rep. 626; *Mason v. United States*, 260 U. S. 545, 43 S. Ct. 200, 67 L. Ed. 396; *United States v. Gilliland*, 312 U. S. 86, 61 S. Ct. 518, 522, 85 L. Ed. 598. However, the rule is applied more strictly in the construction of penal statutes, as the law, in its solicitude for life and liberty, requires that penal statutes shall be narrowly construed. *State v. Fleming*, 173 Md. 192, 195 A. 392; *Gooch v. United States*, 297 U. S. 124, 56 S. Ct. 395, 397, 80 L. Ed. 522.

The Corrupt Practices Act is a remedial measure and should be liberally construed in the public interest to carry out its purpose of preserving the purity of elections. *Matter of Woodbury*, 174 App. Div. 569, 160 N. Y. S. 902; *In re Anti-Saloon League of New York*, 120 Misc. 412, 198 N. Y. S. 605, 606; *Diehl v. Totten*, 32 N. D. 131, 155 N. W. 74, 77, Ann. Cas. 1918A, 884; *Skewes v. Bliss*, 58 Utah 51, 196 P. 850, 852. But, while the statute should be given a liberal construction as to its remedial provisions, it should be strictly construed as to its penal provisions. There is no impropriety in putting a liberal construction on a remedial clause, and a literal construc-

tion on a penal clause in the same statute. *Commonwealth v. Shaleen,* 215 Pa. 595, 64 A. 797; *In re Wilhelm's Petition,* 111 Pa. Super. 133, 169 A. 456. This Court has held that no man can be held guilty of violating a statute unless the act with which he is charged comes plainly within both the letter and the spirit of the statute. *Cearfoss v. State,* 42 Md. 403, 407; *Mitchell v. State,* 115 Md. 360, 365, 80 A. 1020. It has been held, for example, that the words "other thing of value," in the statute forbidding any candidate from expending or promising money or other thing of value in consideration of another's vote or support signify property or something having intrinsic value measurable in money, and do not include an office or position. Ky. St., Sec. 1565b-3; *Van Meter v. Burns,* 176 Ky. 153, 195 S. W. 470; *Roberts v. Sturgill,* 257 Ky. 194, 77 S. W. 2d 789. Likewise, since it appears that the legislative purpose is not defeated by a narrow construction, the words "means or aid" may be read in connection with the preceding words "money, property, transportation," and thus restricted to the means or aid of a similar kind with those specifically mentioned.

If any question ever did exist as to whether the Corrupt Practices Act prohibited a corporation from endorsing a candidate for judge, it was dispelled by the Legislature itself 12 years afterwards, for in 1920 it added a new section to the Act making it unlawful for a corporation to publish or distribute any campaign literature unless it contains the name of the corporation and the names of its officers. Acts of 1920, Ch. 697; Acts of 1945, Ch. 934, Sec. 156. Keeping in mind that the rights of freedom of speech and of the press are held sacred in our government, we hold that the 1920 Act declares unmistakably by implication that a corporation may publish and distribute campaign literature if it contains the name of the corporation and the names of its officers. We accept the rule that statutes which are not inconsistent with one another, and which relate to the same subject-matter, are in *pari materia* and should be con-

strued together so that they will harmonize with each other and be consistent with their general object and scope, although they contain no reference to one another and were passed at different times. *City of Hagerstown v. Littleton*, 143 Md. 591, 599, 123 A. 140.

For more than 25 years the administrative officials of the State have construed Section 157 to the effect that a corporation may lawfully express its views on any candidate for office or any measure to be voted upon by the people. In 1934, when the Baltimore Bar Association endorsed three judicial candidates, two of whom were Republicans, and one a Democrat, the Attorney General of Maryland ruled that a committee of the association could actively support the candidates if it complied with the provisions relating to political committees. The bar committee is subject to the provisions relating to political committees whenever its activities come within the definition prescribed by the Act for that term. If the bar committee were exempt, the Act could be nullified by the incorporation of groups seeking to influence political action but wishing to conceal their financial operations carried on in furtherance of that purpose. Where money is received for such a purpose, the Act requires publicity to disclose its source and amount, even though the activities in connection with an election are purely educational, for their motive is to affect the result of the election and to aid or defeat certain candidates or measures submitted to the voters. *In re Anti-Saloon League of New York*, 120 Misc. 412, 198 N. Y. S. 605, 607. This Court considers that the construction placed upon a statute by administrative officials soon after its enactment, when not changed by legislative or judicial decision, is generally the best construction. It is true that the administrative construction of a statute does not preclude an inquiry by the Court into the correctness of such construction, for no custom, however long and generally it has been followed by officials of the State, can nullify the plain meaning and purpose of a statute. But where the language of a statute is sus-

ceptible of two constructions, a long-continued and unvarying construction applied by administrative officials is strong persuasive influence in determining the judicial construction of the statute, and it should not be disregarded except for the strongest and most urgent reasons. *Leitch v. Gaither,* 151 Md. 167, 176, 177, 134 A. 317; *American-Stewart Distillery v. Stewart Distilling Co.,* 168 Md. 212, 217, 177 A. 473; *Bouse v. Hutzler,* 180 Md. 682, 687, 26 A. 2d 767, 141 A. L. R. 843.

In 1945 the Legislature repealed and re-enacted with amendments Article 33 of the Code and all amendments thereto. Acts of 1945, Ch. 934. By re-enactment of the section now before the Court in exactly the same words contained in the Act of 1908, the Legislature gave tacit approval to the construction placed upon the section by administrative officials. In declaring the meaning of a statute, the Court may avail itself of the construction put upon it by the Legislature itself through long-continued acquiescence. The Legislature's acquiescence in the administrative construction furnishes a strong presumption that the intention has been interpreted correctly. *Wells v. Price,* 183 Md. 443, 37 A. 2d 888. The law now provides that the names of all candidates for judge shall be placed on the ballots or voting machines without any party label or other distinguishing mark or location which might indicate the party affiliation of any such candidate. Acts of 1941, Ch. 703; Acts of 1945, Ch. 934, Sec. 58. A candidate for judge may now file for nomination by more than one political party. Acts of 1943, Ch. 754, Sec. 229 (2) ; Acts of 1945, Ch. 934, Sec. 45 (2). The provision that no certificate of candidacy for nomination shall be accepted unless the candidate is affiliated with the political party whose nomination he seeks does not apply to nominations made at primary elections for the office of judge. Acts of 1945, Ch. 934, Sec. 49. It can now be said that the public policy of the State is to keep partisanship out of the election of judges as far as possible, and to retain in the

judiciary those judges who have demonstrated their integrity, wisdom and sound legal knowledge.

For these reasons we reached the conclusion (1) that the activities of the Bar Association in behalf of the sitting judges are within the scope of its corporate power, and (2) that these activities do not violate the election law of the State. We have therefore affirmed the order and the decree.