## MAYOR AND CITY COUNCIL OF BALTIMORE
### ET AL. *v.* QUAM

[No. 103, September Term, 1972.]

*Decided March 27, 1973.*

*Motion for rehearing filed April 26, 1973; denied May 7, 1973.*

The cause was argued before MURPHY, C. J., and McWILLIAMS, SINGLEY, SMITH and LEVINE, JJ.

*Carol S. Sugar, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellants.

*Samuel S. Eisenberg* for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Shortly after her 1970 retirement from teaching in the Baltimore City school system, appellee, Louise G. Quam (Quam) protested to the Employees' Retirement System of the City of Baltimore (Retirement System) that there were "serious errors and even injustices" in the calculation of her service retirement allowance. Unvindicated in this claim at the administrative level, Quam sought a declaratory judgment in the Baltimore City court against the Mayor and City Council of Baltimore, its Comptroller, and the Board of Trustees of the Retirement System (the City). During those proceedings, the alleged "errors and injustices" resolved into the single legal issue whether Quam was entitled to benefits provided by the supplemental pension provisions of Baltimore City Code (1966 Ed.), Article 22, § 6 (b) (6) with respect to her services for the years 1926-1937. From the judgment of the court (Harris, J.) declaring Quam's right to such supplemental pension benefits the City appealed.

The undisputed factual background is well summarized in Judge Harris's opinion as follows:

". . . Quam was employed as a Public School teacher by the Mayor and City Council of Baltimore City in 1924 and continued in that position for approximately thirteen years until 1937, when she resigned. Thereafter, in 1948, Mrs. Quam returned to the Public Schools and remained a teacher until her retirement on August 15, 1970.

"When . . . [Quam] was appointed to her teaching position in 1924, Baltimore City had no retirement system. However, when the Employees' Retirement System of the City of Baltimore became effective January 1, 1926 (Ordinance 553, 1925-26), . . . [Quam] took advantage of the opportunity then extended to City employees to join the System and began

to make payments by salary deduction on account of the annuity portion of her retirement benefits. By joining the System at its inception . . . [Quam] received, at no cost to her, credit for one year and four months of service between her hiring date and January 1, 1926, the original pension ordinance having provided that the City would give employees, on the payroll on January 1, 1926, paid up pensions and annuities for their periods of service before the System went into effect.

". . . [Quam] continued to make payments on her annuity until she resigned from the School System in 1937, and left her contributions on deposit with the Retirement System until required by the pension ordinance to withdraw them. Upon her return to the School System in 1948, . . . [Quam] again became a member of the Employees' Retirement System and continued to make the prescribed contributions for her annuity until she retired in 1970.

"In 1953 the City Council of Baltimore City adopted Ordinance 819 and, in 1954, Ordinance 1039, both of which permitted eligible members of the Employees' Retirement System to obtain 'credit' for services performed by them before 'last becoming a member' of the System. It is not clear from the pleadings as to which of these two ordinances . . . [Quam] utilized to obtain such credit for her eleven years and ten months of service prior to her resignation in 1937. She was issued a 'Special Certificate of Service Credit' by the Employees' Retirement System following a meeting of the Board of Trustees on June 6, 1955, which states that she is 'entitled to all the rights and privileges accorded to members' by both ordinances. As these ordinances differ only as to the periods for filing claims and the categories of members eligible for ser-

vice credits thereunder, . . . [Quam's] benefits would be the same under both ordinances. Both contain the same provisions directing that eligible employees be given credit for previously rendered service, provided that they pay into the Retirement System, with interest, the contributions which they would have paid had they been members of the System while such previous service was rendered.

"In October 1970, the City Solicitor of Baltimore City . . . issued an opinion . . . [which] questioned the method used by the Retirement System for many years, of determining the eligibility of employees with credit for previously rendered service for supplemental pensions under Article 22, Section 6 (b) (6) of the Baltimore City Code. When this ruling was applied to the determination of . . . [Quam's] benefits, it had the effect of disqualifying her for any supplemental pension and thereby materially diminishing her retirement benefits.

"Since her retirement in 1970, . . . Quam has accepted the retirement checks issued to her but has endorsed them 'under protest', it being her contention that the Retirement System has not allowed her the full amount of benefits to which she is entitled under Article 22 of the Baltimore City Code."

The City's retirement system is, basically, a mandatory contribution plan designed to provide an allowance to those members qualified for retirement by age and years of service, consisting of a pension (provided by City funds) and a matching annuity (provided by the member's mandatory contributions). City Code, Article 22, §§ 6 (b) (1) and (2), 8 (a) (1). A complex maze of ordinances has been enacted to implement and supplement the basic scheme; the provisions of Article 22 necessary for decision in this case are as follows:

"§ 1. *Definitions.*

"The following words and phrases as used in this subtitle, unless a different meaning is plainly required by the context, shall have the following meanings:

\* \* \*

§ 1 (7). *'Prior Service'.*

" 'Prior Service' shall mean service rendered prior to the first day of January nineteen hundred and twenty-six—.

§ 1 (8). *'Membership Service'.*

[Ordinance 553 (1925-1926) defined "Membership Service" as] ". . . service as an employee rendered since last becoming a member.

[Ordinance 1864 (1959) added the words] "or credited as 'Membership Service' under any other section of this subtitle.

§ 1 (9). *'Creditable Service'.*

" 'Creditable Service' shall mean 'Prior Service', plus 'Membership Service' for which credit is allowable as provided in Section 4, Subsection (e) of this Article.

\* \* \*

§ 4. *Service Creditable.*

"(e) Creditable Service at retirement on which the retirement allowance of a member shall be based shall consist of the membership service rendered by him since he last became a member, and also if he has a prior service certificate which is in full force and effect, the amount of the service certified on his prior service certificate.

\* \* \*

§ 6. *Benefits.*

\* \* \*

"(b) *Allowance on service retirement.* Upon retirement from service a member shall receive a service retirement allowance which shall consist of:

"(1) An annuity which shall be the actuarial equivalent of his accumulated contributions at the time of his retirement; and

"(2) A pension, in addition to his annuity, which shall be equal to . . . one one-hundred-thirtieth of his average final compensation in the case of Class B members, multiplied by the number of years of his service since he last became a member; and

"(3) If he has a prior service certificate in full force and effect, an additional pension which shall be equal . . . to one-sixty-fifth [of his average final compensation] in the case of Class B members, multiplied by the number of years of service certified on his prior service certificate; and

"(4) If the member has credit for membership service rendered prior to January 1, 1954, an additional pension equal to the difference between the pension allowable under paragraph (2) above for such service and one one-hundred-fortieth of average final compensation multiplied by the number of years of such service;

\* \* \*

"(6)

\* \* \*

"Notwithstanding anything in this Article to the contrary, if at the time of retirement on or after April 1, 1959, a member is age sixty or older, or has 35 years of service and the retirement allowance consisting of the annuity resulting from the member's contributions for membership service and the pension determined in accordance with paragraphs (2), (3), and (4) above . . . for a Class B member is less than one-sixty-fifth of average final compensation for each year of creditable service, a supplemental pension equal to such difference shall be payable.

"The annuity provided as the result of voluntary contributions permitted under the Pension Ordinance and its amendments shall be payable and shall not be used in determining the supplemental pension, if any, payable under this subdivision, nor in determining the disability pension under Section 6, subsection (d)."

As heretofore indicated, prior to the passage of Ordinances 819 and 1039, now codified, respectively, as Article 22, § 16 (c) and (d),[1] a member of the Retire-

---

1. Article 22, § 16. Additional Opportunity To Obtain Credit For Prior Service

(Ordinance 819, approved October 6, 1953)

(c) "Members in 1954. Any person who is a member of the Retirement System on January 1, 1954, who is not credited in the Retirement System for any service previously rendered as an employee of the City of Baltimore or the State of Maryland *shall be credited with such service* as of January 1, 1954, provided he shall file claim therefor prior to March 1, 1954, with the Board of Trustees and shall pay to the Retirement System by a single payment or by an increased rate of contribution, as may be approved by the Board of Trustees, the contributions, with interest, which he would have paid had he been a member of the Employees' Retirement System of the City of Baltimore while such service was rendered." (Emphasis added.)

(Ordinance 1039, approved May 14, 1954) (slightly revised by subsequent codification)

(d) "Any person who was a member of the Retirement System on April 1, 1954, and who was a member of any Retirement System which is being operated on an actuarial basis, with contributions being made during the active service of new members which are computed to be sufficient to provide the reserves needed to cover the retirement benefits payable on their account, either under the laws of this State or under the laws of any political sub-division of this State, or who was in a service subsequently covered by such a system, and who is not credited in the Retirement System for any service previously rendered as such a member or as such an employee, or who was an employee of one of the several private or semi-public agencies listed in Section 16 of this Article, *shall be credited with such service* as of January 1, 1954, provided he shall file claim therefor prior to July 1, 1954 with the Board of Trustees and shall pay to the Retirement System by a single payment or by an increased rate of contribution, . . . the contributions with interest which he would have paid had he been a member of the Employees' Retirement System of the City of Baltimore while such service was rendered." (Emphasis added.)

ment System (such as Quam) with "interrupted service," *i.e.*, one who resigned, withdrew accumulated contributions, and subsequently returned to City employment and membership in the Retirement System, had no right to "repurchase" or "buy-back" previously rendered service.[2] Ordinances 819 and 1039 permitted persons who were members of the Retirement System in 1954, but who were "not credited in the Retirement System for any service previously rendered" to be "credited with such service as of January 1, 1954," provided the requisite contributions for repurchased service were made. While neither ordinance delineated the retirement benefits the repurchased previous service would be entitled to receive, the Retirement System interpreted such previous service "credit" to include the annuity contributions previously paid and to restore to the member the corresponding pension; the Retirement System reasoned that "as a matter of simple equity . . . if a member paid back to the System under Ordinance No. 819 [or Ordinance No. 1039] his required contributions for his annuity, that this, in turn, restored the corresponding pension which the City provided."

In determining the service retirement allowance due Quam upon her retirement, the City calculated that she had accumulated a total of thirty-five years and two months of membership service, of which twenty-two years was service "rendered since last becoming a member" (1948-1970) and thirteen years and two months was service credited as membership service "under any other section of this subtitle" (eleven years, ten months (1926-1937) repurchased under Ordinances 819/1039, and one year, four months "prior service" credit (pre 1926)). The City calculated that under the mandate of

2. Ordinance 912 (1943), codified as Article 22, § 16 (a) and (b), permitted members with *continuous service* with the City, who rejected the original option to join the Retirement System or who became eligible to join the Retirement System subsequent to the date of their employment, to pay the contribution they would have paid as members plus interest, and thereby obtain credit for their previous uninterrupted service "as if they had been members."

§ 6 (b) (1), Quam's annuity was required to be the actuarial equivalent of all her accumulated contributions at the time of her retirement (a monthly annuity totaling $116.09); that under § 6 (b) (2) Quam was entitled to a pension equal to 1/130th of her average final compensation, multiplied by the number of years of service "since . . . [she] last became a member" (twenty-two years, from 1948-1970)—a pension totaling $105.28 monthly; that under § 6 (b) (3) Quam was entitled to an additional pension for her one year, four months "prior service" (pre 1926) of $12.76 monthly; that under § 6 (b) (4) Quam was entitled to an additional pension of $5.86 monthly based on membership service rendered prior to January 1, 1954 calculated in accordance with the formula therein set forth; that under Ordinances 819/1039 (Article 22, § 16 (c) and (d)) Quam was entitled to an additional pension of $56.62 monthly based on her repurchased service credit of eleven years and ten months (1926-1937) corresponding to the contributions made by her for that period.[3]

In reliance upon the 1970 opinion of the City Solicitor, Quam's claim for a supplemental pension under the provisions of §6(b)(6) was denied. In that opinion, it was stated that "the formula for determining whether an employee is entitled to a supplemental pension is clearly and unambiguously set forth in Section 6(b)-(6)." He outlined the formula in these words:

> "It is simply a matter of determining 'the annuity resulting from the member's contributions for membership service and the pension determined in connection with paragraphs (2), (3) and (4)' [of § 6 (b)], and then determining the 'average final compensation for each year of creditable' service and if, when compared, the former is . . . [with respect to Class B employees] less than 1/65th of average final

---

3. Quám's service retirement allowance, as computed by the City, totalled $296.61 monthly.

compensation, the supplemental pension is payable.

". . . [The] problem revolves around the definition of certain terms used in Section 6 (b) (6) rather than the basic concept of the section. For the purposes of the section, the 'retirement allowance' consists of two elements. The first element is the annuity resulting from the member's contributions for 'membership service.' 'Membership service' is defined in Section 1 of Article 22 as service rendered since last becoming a member or credited as service under any other section, including Section 16 (d) [or Section 16 (c)]. The second element of the retirement allowance is the applicable basic pension benefits contained in Section 6 (b) (2), (3) and (4), as set forth above. The retirement allowance consisting of the total of the two elements as defined above is to be compared with the sum represented by . . . [1/65th of average final compensation for each year of creditable service in the case of Class B employees]. 'Creditable Service' is defined in Section 1 (9) as 'prior service,' (which is elsewhere defined as service rendered prior to January 1, 1926), plus 'membership service' for which credit is allowable as provided in Section 4, subsection (e). Section 4, subsection (e), limits 'creditable service' to service rendered since last becoming a member and service certified on a prior service certificate. This definition makes it clear that creditable service does not include the service which in effect may be 'repurchased' under Section 16 (d) [or Section 16 (c)]. The definition appears to be designedly drawn to exclude Section 16 (d) service [or Section 16 (c) service]."

In denying Quam's claim for a supplemental pension

the City based its calculations on the formula outlined in the City Solicitor's opinion; it added the total of Quam's annuity under § 6 (b) (1) to the amount of her pensions under § 6 (b) (2), (3), and (4) (a total of $239.99), and since that figure was greater than the amount represented by 1/65th of Quam's average final compensation for each year of creditable service ($223.-32),[4] no supplemental pension was deemed payable.

By this method of calculation—combining Quam's annuity for previously rendered service (1926-1937) with her annuity for service since last becoming a member (1948-1970), and "balancing" it against only her pension for service since last becoming a member (1948-1970), the annuity side of the scale was weighted so as to eliminate any supplemental pension for Quam, and for members of the Retirement System who, like Quam, had repurchased interrupted service. As heretofore indicated (but worthy of repetition), the City Solicitor's opinion centered on the definitions of terms used in § 6 (b) (6). The annuity, he maintained, was based upon a member's contributions for "membership service," defined in Article 22, § 1 as service rendered since last becoming a member, or credited as service under any other section, which included service repurchased under Ordinances 819 and 1039 (§ 16 (c) and (d)). The corresponding pension was to be computed according to the mandate of § 6 (b) (2), (3) and (4); in computing the supplemental pension under § 6 (b) (6), the total of these annuities and pensions was to be compared with the sum representing "1/65th of average final compensation for each year of creditable service." The definition of "creditable service", according to the City Solicitor's opinion, excludes from the latter calculation the repurchased previously rendered service, for Article 22, §§ 1 (9) and 4 (e) limit creditable service to prior service (pre 1926) and membership service since last becoming a member.

---

4. The $223.32 figure was arrived at by multiplying 1/65 times twenty-three years, four months times Quam's average final compensation.

The record discloses that for seventeen years (from the passage of Ordinance 819 (1953) to the filing of the City Solicitor's 1970 opinion declaring the practice improper) the Retirement System had been paying to members having credit for previously rendered service supplemental pensions based upon only the members' service "since last becoming a member." As noted by the lower court, "[t]he formula used ignored the member's annuity and pension for previous service, and attempted to apply the concept of equalization between the member's annuity and pension to only that part of his service 'since he last became a member.'" For example, in Quam's case, this formula would have ignored both the annuity and the pension for her 1926-1937 service and her eligibility for a supplemental pension would have been based on calculations limited to her 1948-1970 service.

It was against this background that Judge Harris, in a painstaking and erudite opinion, decided that neither the Retirement System's formula, in use prior to 1970, nor the formula utilized since 1970 in view of the City Solicitor's opinion, was in accordance with the intent underlying enactment of Ordinances 819 and 1039. After observing that these ordinances failed to specify exactly how members repurchasing previously rendered service thereunder were to be "credited for such service," Judge Harris said:

"... the Court's independent research discloses an obvious intent on the part of the City Council to give the employees claiming under these ordinances [819/1039] more than a mere opportunity to pay in money for years of previous service, to increase their annuities. Section 8 (a) (4), in effect in 1953, already provided a means by which members could pay additional funds into the Employees' Retirement System to obtain higher annuities, and Ordinances 819/1039 would have been meaningless unless greater benefits to the qualified

employees were contemplated by the City Council.

"(b) Ordinances 819/1039 were adopted under the subtitle 'Additional Opportunities to Obtain Credit for Prior Service'. This subtitle was added to the pension law in 1943 by Ordinance 912 which, like Ordinances 819/1039, credited qualified members with previously rendered service upon the payment by them of their annuity contributions for the years of such service.* In this ordinance, however, it was directed that the employees who 'paid-up' would be credited for such previously rendered service 'as if they had been members'. As Ordinances 819/1039 were adopted under the same subtitle and for the same purpose, it is reasonable to conclude that the omission therein of the words 'as if they had been members' was either inadvertent, or the draftsman thought that credit 'as members' was implicit and need not be expressly stated.

"It does not strain the Court's imagination to believe that if the ordinances required payments from employees as if they had been members, that the service to be credited was intended to be credited as if they had been members. As there were only two types of services, 'prior' and 'membership', at the time of passage of these ordinances, it appears clear to the Court that what an employee bought pursuant to them was 'membership service' whether or not specifically so referred to.

"(c) Ordinances 819/1039 state quite clearly that an eligible employee, in order to obtain the 'credit' referred to, must pay into the System 'the contributions with interest which he would have paid had he been a member of the Employees' Retirement System of the City of Balti-

* [See footnote 2, *supra.*]

more while such service was rendered'. Absent any express provision therein to the contrary, the Court must conclude that the City Council, in adopting these ordinances, intended that employees, who *paid what they would have paid* if members during such previous service, should receive the *same retirement benefits that they would be due to receive* had they been members during the periods of previous service. It is a matter of simple equity that if a person *pays* as if he had been a member, he must *benefit* on the same basis.

"(d) Finally, as to Ordinances 819/1039, the Court finds that a contractual relationship exists between the City and those members of the Employees' Retirement System who elected to accept the City's offer under these ordinances and paid their 'contributions' as consideration. The City cannot unilaterally, by the passage of any subsequent ordinance, diminish the benefits of the 'credit' acquired by employees under these ordinances in 1953 and 1954, as such ordinances related to the benefit provisions of the pension law then in effect.

'Membership Service' In Conjunction With Ordinances 819/1039

"The City, in its answer, . . . makes reference to the presently codified definition of 'Membership Service' which implies that there are two classes of such service, *i.e.*, service since last becoming a member (original definition) and 'service credited as membership service under any other section of this subtitle'. The latter wording was added by Ordinance 1864 in 1959, five or more years after Ordinances 819/1039 were adopted by the City Council and consequently cannot be considered in determining the intent of Ordinances 819/1039. In 1953-1954 there was only prior

(pre-1926) service and membership service as that term was then used interchangeably with 'service since last becoming a member'. Because there was then no other category of service to which previously rendered service could have been credited so as to produce benefits, the Court finds that the service credited under Ordinances 819/1039 must for all purposes be treated as if it were 'service since last becoming a member'.

'Creditable Service' In Conjunction With Ordinances 819/1039

"(a) In its answer in the present case, the City, . . . following what appears to have been the practice for many years, agrees that a member who has paid-up his annuity payments for previously rendered service is entitled to a corresponding pension from the City.

"(b) As there is no direction in Ordinances 819/1039 that such pension shall be paid, it is apparent that, if a pension for previous service is to be paid at all under Section 6 (Benefits), it must be paid under the authority of Section 6 (b) (2), which uses the factor '—number of years of his service since he last became a member'.

"(c) Clearly, if previously rendered service credited under Ordinances 819/1039 becomes 'service since he last became a member', for the purpose of calculating a pension under Section 6 (b) (2), this previously rendered service must also be treated as 'service since he last became a member' in the determination of 'creditable service' under Section 4 (e).

"(d) The Court is convinced that the City Council not only intended that employees with previously rendered service who 'paid-up' as members should benefit as members, but intended that the service it specifically directed

to be 'credited' would thereby be 'creditable', despite any suggested conflict with the definition in Section 1. Clearly, Ordinances 819/1039 by their context, require a different meaning of 'creditable service'; and in their application, creditable service means prior service (if any), previously rendered service, and service since last becoming a member."

In the course of rejecting the City's contention that previously rendered service did not qualify as "creditable service" for purposes of calculating the supplemental pension benefits under § 6 (b) (6), Judge Harris made the observation that when Ordinances 819/1039 were enacted, Ordinance 1649, passed in 1951, was then in effect and required the City to pay supplemental pensions in order to equalize annuities and regular pensions.[5]

---

5. The historical development of the supplemental pension provisions of the City's Pension Ordinance is relevant to a determination of the issue herein. Although the goal of the City's retirement plan has been, since its inception, to provide an annuity equal to the pension, such goal has not been consistently realized. See Fallin v. Mayor & City Council of Baltimore, 193 Md. 464, 67 A. 2d 256 (1949). We recognized in that case the Chancellor's finding of fact that annuities falling short of pensions had occurred when:

"'the severe decline in the purchasing power of the dollar has made it necessary for the city to increase sharply the pay of its employees, in many categories, and as to such employees, from whose former salaries regular deductions were made, but in a smaller sum, the total of such contributions will not now produce an annuity equal to the pension. The pension is fixed in amount 1/140 of average final compensation multiplied by the number of years of service. Sharply increased final compensation will necessarily require increased pension. The burden of such increases will naturally fall on the city. That responsibility cannot be escaped.'" 193 Md. at 468, 67 A. 2d at 256-57.

Our predecessors went on to hold that the City was not responsible for the payment of increased annuities to equal the pensions.

The first legislative attempt to deal with the problem followed closely behind our decision in *Fallin*. Ordinance 1410 (1950) attempted equalization by requiring employees to make additional payments to the annuity fund. In 1951, Ordinance 1649 refunded the amounts so paid and enacted the predecessor of the present § 6 (b)(6), which provided in pertinent part:

"Notwithstanding anything in the Pension Ordinance

It was Judge Harris's conclusion that full credit must be afforded Quam for all her previous service, *viz.*, that she was entitled to a supplemental pension computed on the basis of both her annuity and pension for all service. In deciding that Quam was "entitled to be paid, retroactively, from the date of her retirement, the supplemental pension which she is entitled to receive when her entire service is treated as membership (and therefore 'creditable') service," Judge Harris held that Ordinance 1864, enacted in 1959, which amended the definition of membership service, had no application to the earlier enacted Ordinances 819/1039; but that, entirely apart from that, it was the intention of the City Council in enacting Ordinance 1864, to affirmatively qualify employees with credited previous service for supplemental pensions. Referring to Ordinance 1864, the court said:

> "The ordinance was poorly drafted, failed to include a modification of Section 4 (e) (creditable

---

or amendments thereto to the contrary, if at the time of retirement a member is age sixty or older or has 35 years of service and the pension provided in the foregoing Sub-section 2 (b) exceeds the amount of the annual annuity provided in the foregoing Sub-section 2 (a) as the result of a member's mandatory contributions based on his normal rate of contribution at the time of entrance into membership, with the interest thereon, a supplemental pension equal to the difference between such pension and such annuity shall be payable."
Effective January 1, 1954, the provision was amended by Ordinance 899 (1953) to read:
"Notwithstanding anything in this Article to the contrary, if at the time of retirement on or after January 1, 1954, a member is age sixty or older, or has 35 years of service and the retirement allowance consisting of the annuity resulting from the member's mandatory contributions and the pension determined in accordance with paragraphs (b), (c) and (d) above for a . . . Class B member is less than one-sixty-fifth of average final compensation for each year of *creditable service*, a supplemental pension equal to such difference shall be payable." (Emphasis added.)
The provision was changed for the last time by Ordinance 1864 (1959)—the present § 6 (b)(6). That Ordinance, as heretofore indicated, also amended the definition of "Membership Service" to mean "service as an employee rendered since last becoming a member or credited as 'Membership Service' under any other section of this Article."

service) to correspond with the broadened definition of membership service and, for reasons which the Court is at a loss to understand, has never been implemented (or amended) to expressly provide full supplemental pensions to members credited with previous service under Ordinances 819/1039. If it were necessary for the Court to make a decision in the present case as to the intent of Ordinance 1864, it would have no hesitancy in concluding that the City Council intended that 'service credited as membership service under any other section of this subtitle' be treated as 'creditable service' for the purpose of determining eligibility for supplemental pensions."

We think it evident that the ordinances under consideration are not models of legislative precision. While there is little available from which to ascertain the intent of the City Council, we are persuaded, after a thorough study of the record before us, and a careful reading of the pertinent provisions of Article 22, that the City Solicitor's 1970 interpretation correctly outlines the formula to be followed in considering Quam's eligibility for a supplemental pension under § 6 (b) (6). Previously rendered service repurchased under Ordinances 819/1039 has, since the time of initial enactment of those ordinances to the present day, been consistently interpreted, first by the Retirement System, and later by the City Solicitor, as service not eligible for supplemental pension benefits. The supplemental pension, first provided in 1951 by Ordinance 1649 (see footnote 5, *supra*) was intended to equalize annuities and regular pensions; Ordinance 899, effective January 1, 1954 (see footnote 5, *supra*) not only changed the formula for determining the amount of supplemental pension to which a member was entitled, but expressly based application of the formula on a member's "creditable service," that term then, as now, being defined (§ 1 (9)) as

" 'Prior Service,' plus 'Membership Service' for which credit is allowable" under § 4 (e), *viz.*, "membership service rendered by him since he last became a member, and also if he has a prior service certificate which is in full force and effect, the amount of the service certified on his prior service certificate." When Ordinances 819/1039 were enacted, there were only two types of service—prior and membership—and neither of these encompassed service repurchased under these ordinances. Whatever the "credit" repurchased under the ordinances by Quam, it was afforded to her "as of January 1, 1954"; and consequently we think her eligibility for supplemental pension benefits necessarily must be determined with reference to the "creditable service" limitation contained at that time in the Pension Ordinance. We cannot agree with Judge Harris's reasons for concluding that the City Council intended "creditable service" to include previously rendered service repurchased pursuant to the provisions of Ordinances 819/1039. On the contrary, we can only presume that the City Council fully understood the meaning of the term "creditable service" when Ordinances 819/1039 and 899 were enacted and became effective on January 1, 1954. *See St. Joseph Hospital v. Quinn*, 241 Md. 371, 216 A. 2d 732 (1966). The Retirement System's treatment of service repurchased under Ordinances 819/1039 as ineligible for the supplemental pension was obviously known to the City Council in 1959 when, by Ordinance 1864, it amended the definition of membership service without changing the meaning of the term "creditable service." We are unwilling to conclude that the City Council's consistent refusal to define previously rendered service repurchased under Ordinances 819/1039 so as to include "creditable service" was not in accordance with its actual intent, or constituted a mere inadvertent omission; even if it was an inadvertent omission, we would be without "the power to correct an omission in the language of a statute, even although the omission was the obvious result of inadvertence." *Birmingham v. Board of Public Works*, 249

Md. 443, 449, 239 A. 2d 923, 926 (1968). *Compare Truitt v. Board of Public Works,* 243 Md. 375, 221 A. 2d 370 (1966). We think it clear that the 1959 amendment of the term "Membership Service" (Ordinance 1864) did no more than confirm the correctness of prior administrative practice; that that definition was not in effect in 1953-1954 when Quam repurchased her previously rendered service is of no significance. Affording proper weight to the consistent administrative interpretation by the Retirement System of Ordinances 819/1039, as they relate to the provisions of § 6 (b) (6), and the definitions contained in Article 22, § 1 (confirmed in part by the City Solicitor's 1970 opinion), and giving due respect to the rule which inhibits our addition of words to ordinances omitted by the Council, we hold that Quam is not entitled to a supplemental pension. *See Board of Fire Comm'rs v. Potter,* 268 Md. 285, 300 A. 2d 680 (1973) ; *Kimball-Tyler Co. v. Mayor and City Council of Baltimore,* 214 Md. 86, 99, 133 A. 2d 433, 440 (1957) ; *Smith v. Higinbothom,* 187 Md. 115, 132-33, 48 A. 2d 754, 763 (1946) ; and *Birmingham v. Board of Public Works, supra.* As none of the other calculations made by the City in determining the amount of Quam's service retirement allowance is in dispute, we shall remand the case for modification of the declaratory judgment entered by the lower court so as to eliminate the supplemental pension from the amount of service retirement allowance which Quam is due to receive.

> *Judgment reversed and case remanded for the entry of judgment consistent with this opinion; costs to be paid by the appellant, Mayor and City Council of Baltimore.*