STATE OF MARYLAND *v.* SINCLAIR
AND SINWELLAN CORPORATION

[No. 148, September Term, 1974.]

*Decided May 8, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*George A. Eichhorn, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and

*Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellant.

*Paul H. Spiller,* with whom were *Morton Richard Kimmel* and *Kimmel, Spiller & Bradley, P.A.* and *Fred S. London* on the brief, for appellees.

O'DONNELL, J., delivered the opinion of the Court.

In December 1972 the appellee Sinwellan Corp. (Sinwellan) employed Franz Hoogland as the general manager of the Great Oak Lodge operated by it near Chestertown, at a salary of $22,500 per year, payable monthly. On May 7, 1973 the appellee, Philippe A. Sinclair (Sinclair), by check No. 699 drawn upon the Peoples Bank of Elkton and countersigned by Mrs. Rena Matthews, office manager for Sinwellan, issued a corporation check to Hoogland in the amount of $977.50 in payment of the net wages due him for the month of April. When Hoogland deposited the check in his account in the Peoples Bank of Chestertown on May 10, 1973 it was returned to him as dishonored on presentment by reason of being drawn against "uncollected funds," *i.e.* certain checks had been deposited by Sinwellan to cover checks drawn upon its account but because the deposited checks had not yet "cleared" the bank refused to honor it. Apparently this check was never redeposited and Hoogland conceded it was not left "for collection."

On the afternoon of May 20, 1973, following an argument with Sinclair, Hoogland's services were terminated for certain alleged derelictions. On May 21st another check, No. 804, was similarly issued to Hoogland in the amount of $866.76 representing, upon severance, payment for the services rendered by him during the first 20 days in May. When Hoogland presented the second check, on May 22, 1973, at the Peoples. Bank of Elkton for payment he was there informed that the check could not be paid because "we do not have the money here," or "there were uncollected funds in the account." When the check was returned to

Hoogland the cashier affixed a slip to it indicating that it was "returned unpaid" due to "uncollected funds." Similarly, this second check was never redeposited or left with the bank for collection. Later that same day Sinclair caused a telegram to be sent on behalf of Sinwellan advising Hoogland, at his residence then in Lodi, New Jersey, that "Inventory shortages have become substantial enough to warrant previous [sic] action on our part. Payment stopped on checks 699 and 804 pending completed inventory."

As a result of the dishonor of both checks the State's Attorney for Kent County on August 29, 1973 filed a criminal information (No. 2136)[1] charging Sinclair and Sinwellan,[2] alternately and separately, with violation of Maryland Code (1957, 1971 Repl. Vol. [1974 Cum. Supp.]) Art. 27, § 140 (with obtaining from F. L. Hoogland, by false pretenses, "services" — "of the goods, chattels, moneys and properties" of Hoogland "with intent to defraud"), and of Art. 27, § 144 (with obtaining "goods and services" from Hoogland by means of a check with intent, at the time of giving such check, to stop payment).[3]

During the course of a jury trial on October 9, 1973, in the Circuit Court for Kent County, presided over by Judge James A. Wise, motions for judgments of acquittal made at the close of the evidence presented by the State on behalf of each of the defendants were granted, pursuant to Maryland Rule 755 b, as to each of the counts which charged them with the crime of false pretenses in violation of Art. 27, § 140. By its verdict the jury acquitted both Sinclair and Sinwellan on both the remaining counts (counts one and two) arising from the issuance of check No. 699 on May 7, 1973, but returned guilty verdicts as to each of the appellees for a violation of Art. 27, § 144, with respect to check No. 804, issued on May

---

1. *See* Maryland Rule 708.
2. Although Mrs. Rena H. Matthews was one of the cosigners with Sinclair on each of the checks she was not charged.
3. Each of the checks (Nos. 699 and 804) was the subject of four separate counts in the information which charged Sinclair individually and Sinwellan Corp. separately with violations respectively of Maryland Code (1957, 1971 Repl. Vol. [1974 Cum. Supp.]) Art. 27, §§ 140 and 144.

21, 1973.[4] Following the denial of motions for new trial and from the judgments entered [5] upon the guilty verdicts, Sinclair and Sinwellan seasonably appealed to the Court of Special Appeals. That court, in *Sinclair & Sinwellan Corp. v. State*, 21 Md. App. 477, 319 A. 2d 549 (1974),[6] in reversing the convictions, after first observing that "the mischief the statute seeks to remedy is the wrongful obtention of something of value with a negotiable instrument issued by one, who at the time of issuance, intends to stop payment," pointed out that "it is implicit that, within the aegis of the crime created by § 144, the dishonor or disregard of the instrument by the drawee must have as its cause a stop order or countermand before the presumption [of intent to defraud] may be used against the maker," and that "[i]f the dishonor or disregard by drawee is the result of any other cause, no presumption arises that at the time of issuance the maker intended to stop or countermand payment." (21 Md. App. at 479, 319 A. 2d at 550). That court found that the record indicated "conclusively that the check described in the information was dishonored or disregarded for 'uncollected funds' " and that, even though the cashier at the drawee bank had subsequently received a stop payment on the check, his testimony nevertheless clearly indicated that "the cause of dishonor or disregard of the check . . . was not the stop order or countermand," so that "[a]s a consequence, the presumption [of an intent to cheat and defraud] was not available to relate the intent to countermand back to the initial issuance of the check" — without which presumption "the evidence was not sufficient to permit the case to go to the jury."

---

4. Counts 5 and 6 of the information.

5. Sinclair was sentenced to a term of six months imprisonment, three months of which was ordered suspended upon the payment of restitution in the amount of $1,844.77 (the total represented by the two checks); Sinwellan Corp. was fined $1,000, which fine was suspended.

6. No. 817 involved convictions of the same appellants following a jury trial on October 25, 1973, in the same court, for a violation of Code, Art. 27, § 142, in connection with the issuance of a check on May 20, 1973 to John Diskau, the owner of a television repair business, in the amount of $1,052.20, representing the balance due Diskau on an open account for goods and services antecedently supplied. Those convictions were similarly reversed by the Court of Special Appeals and are not here before this Court.

It was in this posture of the case that we granted the petition of the Attorney General to issue a writ of certiorari. We shall affirm the result reached by the Court of Special Appeals, but on a more fundamental premise — the inapplicability of the provisions of Art. 27, § 144, to the facts in the case, since the issue was preserved for our review by the appellees' renewed motions for judgments of acquittal under Maryland Rule 755 b, made at the close of all the evidence. That statute, in pertinent part, provides as follows:

> "Every person who shall obtain *money, credit, goods, wares or anything of value,* of the value of one hundred dollars or more, from another by means of a check, draft or any other negotiable instrument of any kind, with intent at the time of giving such instrument without the consent of such other to stop or countermand the payment of the same or otherwise to cause the drawee thereof to disregard or dishonor or refuse to recognize such instrument, shall be deemed to have obtained such *money, credit, goods, wares, or other thing of value* with intent to cheat and defraud another and upon conviction, shall be fined or imprisoned or both, as provided in § 140 of this article, at the discretion of the court. . . . And upon the trial of any person accused of violation of this section, the fact that such person without the consent of such other to stop or countermand the countermanded payment of such instrument, or otherwise caused the drawee to disregard or dishonor the same *without returning or tendering the return of the thing so obtained* shall be presumptive evidence of such intent to cheat and defraud. . . ." (Emphasis supplied.)

When what is now § 144 was initially enacted by the General Assembly by Ch. 605 of the Acts of 1920 — in substantially the same form as now provided, as to the gravamen of the offense — it complemented what has come to be known as the Worthless Check Act, originally enacted

by Ch. 281 of the Acts of 1914 and now codified as Art. 27, § 142. The Worthless Check Act "in substance provide[d] that money or other things therein named, obtained by the giving of a worthless check or other instrument, as therein stated, shall be deemed to have been obtained by means of false pretenses, where the same was done with the intention to cheat and defraud, and 'the giving of the aforesaid worthless check, draft or negotiable instrument shall be *prima facie* evidence of intent to cheat or defraud,' subject to the provision" that the drawer shall deposit with the drawee of such paper within ten days thereafter funds sufficient to meet the same. *Lyman v. State,* 136 Md. 40, 49, 109 A. 548, 552 (1920).

As part of the legislative scheme Ch. 605 of the Acts of 1920 repealed and re-enacted in virtually identical language the provisions of the Worthless Check Act. Each of these sections, as enacted, related to the obtention of "money, credit, goods, wares or anything of value by means of a check, draft or any other negotiable instrument of any kind. . . ." Under each of these statutes, the issuance of the check, draft or negotiable instrument, under § 142 where the check was returned as worthless and under § 144 after stopping or countermanding payment, is considered to be presumptive evidence of an intent to cheat and defraud.

Both statutes were enacted to supplement the provisions of the False Pretense Act, now codified as Art. 27, § 140, which proscribes the obtaining from any person, by any false pretense, "any chattel, money or valuable securities" with intent to defraud, and which was first enacted by Ch. 319 of the Acts of 1835.

In a prosecution under the False Pretense Act (§ 140) "the State has the burden of proving that there was 'a representation of an existing fact made with intent to defraud, and that the operation of such representation as a deception *induced a transfer and the obtaining of the money or property by the person committing the fraud* to the loss of another.' " (Emphasis supplied.) *Marr v. State,* 227 Md. 510, 514-15, 177 A. 2d 862, 864 (1962); *Willis v. State,* 205 Md. 118, 123-24, 106 A. 2d 85, 87 (1954).

"It was obviously because of the difficulty so frequently encountered in proving fraudulent intent [under the False Pretense Act] that the Legislature provided in the Worthless Check Act that the giving of a worthless check raises a *prima facie* presumption of an intent to defraud . . . ." *Willis v. State, supra,* 205 Md. at 124-25, 106 A. 2d at 88.

Under both statutes, however, it is necessary that the evidence show that the victim actually relied upon the false representation. In *Levy v. State,* 225 Md. 201, 170 A. 2d 216 (1961), Judge Henderson, for this Court, after pointing out that the offense of false pretenses under § 140 and the obtaining of money by bad check under § 142 are separate offenses, and an intent to defraud is a necessary ingredient under both, stated:

"However, it seems to be well established that it is essential both in a charge of obtaining money by false pretenses *and* under the bad check act *that the victim actually rely upon the false representation.* See 22 Am. Jur. *False Pretenses* § 25, and 2 Wharton, *Criminal Law & Procedure* (Anderson's ed.), § 600. The rule that *reliance must be shown* was stated by this Court in *Kaufman v. State,* 199 Md. 35, 40, although actual reliance was found to exist in that case. See also *Willis v. State, supra,* at p. 127." (Emphasis supplied.) 225 Md. at 206-07, 170 A. 2d at 218.

Although the Worthless Check Act, and what is now codified as Art. 27, § 144, initially included within the scope of each only "money, credit, goods, wares or anything of value," the Worthless Check Act was subsequently amended to include "services, release from any debt or obligation for services, or for materials or labor in the construction or repair of any building or buildings, wares or anything of value." [7] Article 27, § 144, however, as to the scope of the

---

7. Chapter 483 of the Acts of 1941 brought within the scope of the section "release from any debt or obligation for materials or labor in the construction of any building or buildings"; Ch. 497 of the Acts of 1963 included "services" within the scope of the statute, as well as "release from any debt or obligation for services."

property within its ambit remains unchanged from its initial enactment.

Where statutes have been held to require proof that the victim parted with money or property in reliance upon the validity of the check tendered it has generally been held that there is no intent to defraud under such statutes if the check tendered is given in payment of a preexisting debt — since nothing in exchange for the worthless check has been obtained. *See* R. Anderson, 2 Wharton's Criminal Law and Procedure, §§ 615-16 (1957).

Professor Perkins, in his respected and oft quoted work on Criminal Law, in the chapter on "False Pretenses — Cheating by Check," states:

> "Differences in the statutes permit little in the way of generalization. At times a fraudulent check clause is included in the false pretense section itself (footnote omitted), but more frequently it is separate (footnote omitted). If the statute speaks only in terms of money, property or thing of value obtained by such a check it is not violated if nothing was obtained (Currlin v. State, 110 Tex.Cr.R. 18, 6 S.W.2d 767 (1928); Lochner v. State, 218 Wis. 472, 261 N.W. 227 (1935). Cf. Wis.Stats. § 343.41 (1953).), as for example where it is used to pay a pre-existing debt (Berry v. State, 153 Ga. 169, 111 S.E. 669 (1922); Broadus v. State, 205 Miss. 147, 38 So.2d 692 (1949).), or to pay an overdue note without taking up the note (Douglas v. State, 80 Ga.App. 761, 57 S.E.2d 438 (1950).)." R. Perkins, Criminal Law at 317 (2d ed. 1969).

*In accord see also* Clark and Marshall, Crimes, at 825, n. 81 (6th ed. 1958).

Generally, under statutes prohibiting the obtention of "any money, goods or other property of value," by means of a worthless check, with an intent to defraud, it is necessary that the property obtained pass as a direct result of the giving of the worthless check, and the payment of an existing obligation, or pre-existing debt, has been held not to

be within the proscription of such statutes. *See Phillips v. State*, 24 Ala. App. 456, 136 So. 480 (1931) (where the check was given in payment for services rendered to the defendant in selling certain advertisements); *State v. Harris*, 136 So. 2d 633 (Fla. 1962) (where the check was given in part payment of an existing obligation); *Berry v. State*, 153 Ga. 169, 111 S. E. 669 (1922) (where the check was given in payment of a loan made to pay a fine); *Vasser v. Berry*, 85 Ga. App. 435, 69 S.E.2d 701 (1952) (in a suit for malicious prosecution where the plaintiff had given the defendant a worthless check in payment of a pre-existing florist bill owed by her parents); *People v. Cundiff*, 16 Ill. App.3d 267, 305 N.E.2d 735 (1973) (where the defendant purchased grain on March 28, 1972, gave the seller a check therefor on April 6th and requested him to hold the check until April 10th, which he did); *State v. McLean*, 216 La. 670, 44 So. 2d 698 (1950) (where a check was issued three days after delivery of a cargo of bananas); *Pollard v. State*, Miss., 244 So. 2d 729 (1971) (where the defendant purchased three used cars on September 5, 1968 and requested the seller to hold the check until the following week); *Jackson v. State*, 251 Miss. 529, 170 So. 2d 438 (1965) (where the defendant gave a check "as a bond" for performance of a contract to remove some buildings from a tract of land in order to clear it); *Broadus v. State*, 205 Miss. 147, 38 So. 2d 692 (1949) (where a check was given after the defendant had completely removed and departed with some machinery); *State v. Jarman*, 84 Nev. 187, 438 P. 2d 250 (1968) (where the check was given for a past-due grocery bill); *Hoyt v. Hoffman*, 82 Nev. 270, 416 P. 2d 232 (1966) (where a check was given on an open account for meat which had been purchased at wholesale); *Norman v. State*, 170 Tex. Cr. 25, 338 S.W.2d 714 (1960) (where the check was given in payment of "motel services" incurred while the defendant resided at the motel); *State v. Pishner*, 72 W. Va. 603, 78 S. E. 752 (1913) (where the check was given in payment of a pre-existing debt incurred at a general store).

The Illinois court, in *People v. Cundiff, supra,* reasoned as follows:

"The giving of a worthless check in payment of a preexisting debt is generally held not to be within the ban of the statute (Annot., 59 A.L.R.2d 1159, sec. 2), the reasons being that the party alleged to have been defrauded did not, on the strength of the check, part with anything of value and further the acceptance of a check does not pay a debt. The payment is only conditional upon the integrity of the check in the absence of an agreement to the contrary. The check was a conditional payment and being dishonored the conditional payment was abortive." 16 Ill. App. at 269, 305 N.E.2d at 737-38.

In *Phillips v. State, supra,* the Court of Appeals of Alabama, after noting that its statute made it an offense to obtain "any money, merchandise, property, services or other things of value" by means of a worthless check, stated: "The gravamen of the offense is the intent to defraud, and, to constitute the offense denounced by the statute, the use of the check must cause the party who claimed to be defrauded thereby to part with something of value." 24 Ala. App. at 456, 136 So. at 481.

In reasoning that the check given by the defendant for his pre-existing debt was not within the protection of the "worthless check statute" that court stated:

"It affirmatively appears, we think, from all the evidence, that the alleged injured party, as a matter of law, has not been, nor could not have been, defrauded in the transaction complained of. The check in question was admittedly given for a past-due debt. The nonpayment of the check did not impair the existing obligation due to her by appellant. As insisted by appellant: 'Mrs. Riggins was not deprived of any right she had against the defendant by the acceptance of the check. She could have sued the defendant immediately upon non-payment of the check on the debt for which the check was given, and she could have recovered and the defendant could not have defeated the suit,

because he had given the check. She likewise could have sued and recovered on the check. She did not part with anything and she did not lose any right she had by taking the check." 24 Ala. App. at 457, 136 So. at 481.

See also 32 Am.Jur.2d False Pretenses § 78 (1967) and Annot., 59 A.L.R.2d 1159-60 (1958), "Construction and Effect of 'Bad Check' Statute with Respect to Check in Payment of Pre-Existing Debt," noting that the giving of a worthless check for a past-due obligation is not the obtention of "anything of value."

A case factually similar to the case before us is *Maggard v. Commonwealth*, 262 S.W.2d 672 (Ky. 1953), where the appellant, who operated a coal mine, gave a check in payment of wages previously earned by one Jamerson for loading coal and working in the mine which was dishonored upon presentation. In reversing the appellant's conviction under the Kentucky worthless check statute, virtually identical to ours, that court held, on the authority of *Commonwealth v. Hammock*, 198 Ky. 785, 787-88, 250 S. W. 85 (1923), that "A necessary element of the offense is an intent to defraud, and it is well settled that when a check is given in payment of a debt without simultaneously obtaining money or property, the offense is not completed." The court concluded that since the case was merely in payment of a debt for Jamerson's wages it was not punishable under the statute.

In *Commonwealth v. Hammock, supra*, the defendant issued a check in repayment of a loan obtained by the defendant 20 to 30 days before the check was issued and there were insufficient funds for its payment when presented. In holding that no offense was committed under the Kentucky "worthless check act," the Court of Appeals of Kentucky, in upholding the sustaining of a demurrer to the indictment, stated:

"In other words, Hammock had obtained the money 20 or 30 days before the check was given. There was no money passed to him simultaneously with the

issual of the check. He did not, therefore, obtain the money, or any part thereof, by reason of the check or its issual or delivery, and did not issue and deliver the check with the intent to obtain such money, but only in payment of a past-due obligation. Appellee Hammock could not, therefore, have issued the check with intent to defraud. Such intention is of the essence of the offense — the gravamen. Without intent to defraud no offense is committed." 198 Ky. at 787, 250 S. W. at 86.

In *Currlin v. State*, 110 Tex. Cr. 18, 6 S.W.2d 767 (1928), in holding that the defendant, who stopped payment of his check given for one month's rent due in advance, did not violate the Texas version of the worthless check act, called "swindling," that court stated:

"Appellant took nothing from Mrs. Walker in exchange for his check. He deprived her of neither money nor property, nor anything of value, such as is referred to in articles 1545 and 1546 of our Penal Code defining the offense of swindling. If he owed her anything for the rent of her property before he gave her the check he still owed it afterwards. Allen v. State, 58 Tex.Cr.R. 494, 126 S.W. 571; State v. Pishner, 72 W.Va. 603, 78 S.E. 752; Ex parte Wheeler, 7 Okl.Cr. 562, 124 P. 764. . . ." 110 Tex. Cr. at 19, 6 S.W.2d at 768.

Although each of the above cited cases arose under "worthless check" statutes, and all held that a worthless check given in payment for a pre-existing debt did not constitute, within the language of those statutes, the obtention of "any money, goods or other property of value" by means of such a check, we think their holdings and the rationale expressed therein are here particularly apposite inasmuch as Art. 27, § 144, by its express terms, is limited to the obtention of "money, credit, goods, wares or anything of value" by means of a check, draft or other negotiable instrument, with intent at the time of giving such

instrument to stop or countermand the payment thereof, and because the stopping of payment or the countermanding of such instrument effectually results in the check being rendered "worthless" with the same detriment to the person who, in reliance upon such a check, parted with "money, credit, goods, wares or anything of value," and to the same extent as if the check upon which reliance was placed by him had been dishonored because of insufficient funds.

Thus, it is palpably clear that when on May 21, 1973 the appellees issued Hoogland a check (No. 804) in the amount of $866.76 representing payment to him for services rendered during the first 20 days of May they did not obtain from him by reliance upon that check any "money, credit, goods, or wares," but rather attempted to make payment to him of an existing obligation.

Nor, as we see it, did the appellees by that check obtain "anything of value" from Hoogland. Under the rule of *ejusdem generis,* where the general words in a statute, such as "other thing of value," used in § 144, follow the designation of particular things or classes of subjects, such as "money, credit, goods, wares," etc., the general words in the statute will usually be construed to include only those things of the same class or general nature as those specifically antecedently mentioned. This rule is based on the supposition that if the legislature had intended the general words to be considered in an unrestricted sense it would not have enumerated the particular things.[8] *See Smith v. Higinbothom,* 187 Md. 115, 130, 48 A. 2d 754, 761 (1946). *See also Culotta v. Raimondi,* 251 Md. 384, 387, 247 A. 2d 519, 521 (1968). The rule is applied more strictly in the construction of penal statutes — such as is Art. 27, § 144 — since the rule, in its solicitude for life and liberty, requires that penal statutes be narrowly construed. *Smith v.*

---

8. *Compare* Maryland Code (1957, 1971 Repl. Vol. [1974 Cum. Supp.]) Art. 27, § 142, encompassing within its original terms the obtention of "money, credit, goods," and by subsequent amendments, "services, release from any debt or obligation for services, or for materials or labor in the construction or repair of any building or buildings, wares or anything of value." *See* n. 7, *supra.*

*Higinbothom, supra,* citing *State v. Fleming,* 173 Md. 192, 196, 195 A. 392, 393 (1937); and *Gooch v. United States,* 297 U. S. 124 (1936).

It has been held that the words "other thing of value," used in a statute forbidding any candidate from expending or promising money or other thing of value in consideration of another's vote or support, signify property or something having intrinsic value measurable in money. *See Smith v. Higinbothom, supra,* citing *Roberts v. Sturgill,* 257 Ky. 194, 77 S.W.2d 789 (1934); and *Van Meter v. Burns,* 176 Ky. 153, 195 S. W. 470 (1917). The term "other valuable thing," as used in such statutes has been held to include everything of value provided that it has a physical attribute and does not constitute merely a pecuniary advantage. *See State v. Thatcher,* 35 N.J.L. 445 (1872); *State v. Tower,* 122 Kan. 165, 251 P. 401 (1926). *See also* 35 C.J.S. *False Pretenses* § 26, at 847 (1960).

In *Shelton v. Thomas,* 11 S.W.2d 254 (Tex.Civ.App. 1928), the rule of *ejusdem generis* was applied in construing the Texas worthless check statute, prohibiting the obtention of "any money or other thing of value" with intent to defraud by the giving of a check without sufficient funds to pay the same, in a proceeding brought by an attorney who had given legal advice to Shelton in expectation of a $500 fee and Shelton, as part payment, gave Thomas a check in the amount of $300, on which check payment had been stopped. That court, pointing out that the gist of the offense under the statute was the fraudulent acquisition of "money or other valuable thing" by the use of a worthless check, found that the legal advice given and promised did not constitute personal or movable property or money, as used in the definition of the statute; that it was not an "other thing of value" of the same general kind and class as "money."

Thus, we similarly conclude that the delivery of the May 21st check to Hoogland did not constitute the obtention of "anything of value" to the appellees from Hoogland of the same class or general nature as "money, credit, goods or wares."

Our interpretation of the statute and its lack of applicability to the facts in this case is bolstered by that provision in Art. 27, § 144, which brings into play "presumptive evidence of such intent to cheat and defraud" only where there has not been a return or tender of the return of the "thing so obtained." It is obvious that the appellees could not return or tender the return to Hoogland of the personal services rendered by him during the first 20 days in May as general manager of the Great Oak Lodge.

As early as 1889 in *State v. Blizzard*, 70 Md. 385, 389, our predecessors held that to constitute the crime of false pretenses something within the definition of the property within the protection of the statute must have been obtained and that an instrument, without assignment or transfer, could not constitute a "valuable security" of which a party had been deprived by false pretenses, when nothing could pass to the defendant more than the bare paper upon which the instrument was written.

No man may be held guilty of violating a statute unless the act with which he is charged comes plainly within both the letter and the spirit of the statute. *See Smith v. Higinbothom, supra,* citing *Mitchell v. State,* 115 Md. 360, 365, 80 A. 1020, 1022 (1911); and *Cearfoss v. State,* 42 Md. 403, 407 (1875). *See also Culotta v. Raimondi, supra,* 251 Md. at 389, 247 A. 2d at 522. In the instant case we cannot find that the facts elicited in the appellees' trial brings the case within the language of the statute (§ 144) or its intent.

Hoogland, upon receipt of the check, parted with nothing of value and the acceptance by him of the check did not discharge the corporation's debt to him for his wages. *See People v. Cundiff, supra.* The nonpayment of the check did not impair the existing obligation due him by Sinwellan; the check did not discharge any obligation to him for wages due and he could have sued on the debt for which the check was given, and, indeed, could have sued upon the check. *See Phillips v. State, supra.*

The criminal information filed in this case contained no counts charging a violation of Art. 27, § 143, which makes it a misdemeanor for one, with intent to cheat and defraud

another, to obtain services from such other on a promise of payment of wages therefor and who shall fail to pay for said services when payment is due and demanded, and we do not here theorize as to whether or not the facts of this case would have brought it within the scope of that statute. We have no difficulty however, for the reasons we have given, in concluding that the provisions of Art. 27, § 144, were completely inapplicable to the issuance of the check by the appellees on May 21, 1973, purportedly in payment of Hoogland's wages, independent of the issue as to whether or not the check was dishonored upon presentation factually because it was drawn against "uncollected funds," or because payment thereof had been stopped or countermanded.

*Judgments of the Court of Special Appeals affirmed; costs to be paid by Kent County.*