IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-038

Filing Date: September 14, 2011

Docket No. 32,130

STATE OF NEW MEXICO,

Plaintiff-Petitioner,

v.

DEBBIE CRUZ,

Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Robert A. Aragon, District Judge

Gary K. King, Attorney General
Ann M. Harvey, Assistant Attorney General
Santa Fe, NM

for Petitioner

Jacqueline L. Cooper, Acting Chief Public Defender
Carlos Ruiz de la Torre, Assistant Appellate Defender
Santa Fe, NM

for Respondent

OPINION

BOSSON, Justice.

{1}     Defendant was convicted of issuing payroll checks with insufficient funds to cover them. Because the worthless checks were issued a week *after* the last day of the pay period, the Court of Appeals reversed the convictions, relying on previous opinions of our respective courts to conclude that the Worthless Check Act ("the modern Act"), NMSA 1978, §§ 30-36-1 to -10 (1963, as amended through 1984), applies only to a "contemporaneous exchange" and not to pre-existing or antecedent debts. We reject that distinction as inconsistent with the clear legislative intent and purpose of the Act. We reverse and remand

to the Court of Appeals for their consideration of the remaining issues raised, but not decided, on appeal.

**BACKGROUND**

**{2}**     Debbie Cruz ("Defendant") was the owner and president of DGM Construction. DGM employed Benjamin Kallestewa, Vicki Kallestewa, and Leo Erachio (collectively, "the workers") to work on a construction project on the Zuni Pueblo in 2002. Defendant signed all the company's paychecks, which were delivered to the workers by the site foreman one week after the end of the pay period. In June 2002, the workers cashed four paychecks at a local trading post. The trading post owner deposited the checks at his bank, but the bank returned all four checks for insufficient funds. The trading post owner made three additional attempts to deposit the checks before the bank returned the checks for a final time, noting that the "account [had] closed."

**{3}**     Defendant was charged with four counts of issuing worthless checks, pursuant to Section 30-36-4 of the Act. Convicted on each count, Defendant argued on appeal, among other issues, the lack of sufficient evidence to prove that she had issued a check "in exchange for anything of value" as set forth in Section 30-36-4 of the Act. *State v. Cruz*, 2010-NMCA-011, ¶¶ 1, 26, 40, 147 N.M. 753, 228 P.3d 1173. The Court of Appeals agreed, reversing Defendant's convictions on that ground. *Id.* ¶¶ 1, 41.

**{4}**     Relying on some hoary case law from this Court and a more recent case of its own, the Court of Appeals concluded that the statutory "exchange" for which the worthless checks issued—in this case an exchange of labor for wages—had to be "contemporaneous," meaning the checks had to issue at or near the end of the pay period. *Id.* ¶¶ 31, 33, 38. Because these paychecks were delivered one week after the end of the pay period, they were in payment of an "antecedent or pre-existing debt" not covered by the Act. *Id.* ¶¶ 32-33. Thus, if we were to follow the logic of the Court of Appeals, the Act would never apply to most payroll situations in which a delay of a week or two between the end of the pay period and receipt of a paycheck is common. We granted certiorari to determine whether the Court of Appeals correctly interpreted the Act and whether the case law on which it relied has any continuing vitality. *State v. Cruz*, 2010-NMCERT-001, 147 N.M. 674, 227 P.3d 1056.

**DISCUSSION**

**{5}**     As phrased in the petition for certiorari, we consider whether the Act's prohibition against issuing worthless checks "in exchange for anything of value" applies to checks issued for labor, often "paid within the traditional two weeks required for processing payroll." "We review issues of statutory and constitutional interpretation de novo." *State v. Lucero*, 2007-NMSC-041, ¶ 8, 142 N.M. 102, 163 P.3d 489.

**{6}**     This is the first time we apply the Act in its modern form, as it has been approximately ninety years since we last spoke on this subject. We considered predecessor

2

versions of the Act in the early part of the last century. Since our last relevant review, *see generally State v. Davis*, 26 N.M. 523, 194 P. 882 (1921) (applying the 1919 Act), it has been amended *or replaced in its entirety* nine times. *See* 1929 N.M. Laws, ch. 126, § 1; 1937 N.M. Laws, ch. 142, §§ 1-5; 1953 N.M. Laws, ch. 132, § 1; 1959 N.M. Laws, ch. 113, §§ 1-2; 1961 N.M. Laws, ch. 206, § 1; 1963 N.M. Laws, ch. 315, §§ 1-10; 1965 N.M. Laws, ch. 114, §§ 1-2; 1979 N.M. Laws, ch. 8, §§ 1-2; 1984 N.M. Laws, ch. 110, §§ 1-2. Thus, our *Davis,* 26 N.M. 523, 194 P. 882, opinion from 1921—the most recent relevant case from this Court—considered a substantially different statute.

**{7}**     We begin our analysis by looking at the language of the modern Act, for the most part enacted in 1963, and the plain meaning of its text. *See State v. Moya*, 2007-NMSC-027, ¶ 6, 141 N.M. 817, 161 P.3d 862 ("[O]ur primary goal is to effectuate the Legislature's intent. We do so by looking first to the words the Legislature chose and the plain meaning of the language."). We will then turn to prior iterations of the Act and the case law interpreting them and determine whether such a comparison can shed any light on the Act in its present form.

**{8}**     Defendant was convicted of violating Section 30-36-4 of the Act, which states:

> It is unlawful for a person to issue *in exchange for anything of value*, with intent to defraud, any check, draft or order for payment of money upon any bank or other depository, knowing at the time of the issuing that the offender has insufficient funds in or credit with the bank or depository for the payment of such check, draft or order in full upon its presentation.

(Emphasis added.) This appeal turns on the meaning of the phrase in Section 30-36-4 "in exchange for anything of value."

**{9}**     The Act defines a "thing of value" to include "money, property, *services*, goods and wares; and lodging." Section 30-36-2(D) (emphasis added). The Act does not define "exchange," *see* § 30-36-2 (defining only "check," "person," "draw," "thing of value," and "credit"), and so we must interpret the word by applying its ordinary meaning. *See Oldham v. Oldham*, 2011-NMSC-007, ¶ 10, 149 N.M. 215, 247 P.3d 736 ("'[W]e look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended.'" (quoting *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135)). The ordinary definition of "exchange" includes a broad construction, "[t]o give in return for something received," and more specific interpretations, such as "trade" and "[t]o give and receive reciprocally," among others. *The American Heritage Dictionary* 619 (4th ed. 2000). Without any further guidance as to the definition of "exchange," we may appropriately apply any of the ordinary definitions.

**{10}**     Thus, under a straightforward, textual reading of the Act, its language would appear to embrace the present dispute arising from paychecks issued in exchange for labor. Recall

3

that the Act specifically includes "services" within the definition of "thing of value," which can only mean that our Legislature intended to cover situations in which workers are paid by check for their "services." As we will address later, the text of the Act does *not* condition its protections on whether payment is a "contemporaneous" transaction; the word never appears in the Act. Nor does the Act say that worthless checks issued in exchange for "antecedent or pre-existing debts" are excluded; those words are equally absent from the text of the Act.

**{11}** Our textual reading of the operative portion of the Act comports with its stated purpose as well. *See Lion's Gate Water v. D'Antonio*, 2009-NMSC-057, ¶ 23, 147 N.M. 523, 226 P.3d 622 ("Statutes are enacted as a whole, and consequently each section or part should be construed in connection with every other part or section, giving effect to each, and each provision is to be reconciled in a manner that is consistent and sensible so as 'to produce a harmonious whole.'" (quoting *Key v. Chrysler Motors Corp.*, 121 N.M. 764, 769, 918 P.2d 350, 355 (1996)). In the words of our Legislature, the purpose of the Act is

> to remedy the evil of giving checks on a bank without first providing funds in or credit with the depository on which they are made or drawn to pay or satisfy the same, which tends to create the circulation of worthless checks on banks, bad banking, check kiting and mischief to trade and commerce.

Section 30-36-3.

**{12}** Applying the Act to worthless payroll checks, with or without a lapse of time between payment and work performed, presumably furthers the purposes of the Act. Worthless payroll checks, no less than any others, go to the heart of the "evil of giving checks on a bank without first providing funds in or credit with the depository." *Id.* Worthless checks issued for payroll have the same deleterious effect on the banking system and represent a "mischief to trade and commerce," *id.*, whether or not the bad checks issue contemporaneously with the last work day, or a week or two later. Thus, reading a strict requirement of "contemporaneous" into the Act's exchange, would appear to undercut the laudable policy goals of the Act.

**{13}** Perhaps most persuasive is that if we were to exclude common payroll transactions from the Act, then we would narrow significantly the scope of the Act. Indeed, we would render the inclusion of "services" within the definition of "thing of value" practically meaningless. Thus, even aside from the text of the Act, if we focus on an interpretation that fosters, not obstructs, the beneficial goals of the Act, then the direction taken by our Court of Appeals gives rise to considerable doubt.

**The Court of Appeals Opinion**

**{14}** How did our Court of Appeals come to such a different conclusion? First, we must acknowledge some of our case law that, quite frankly, begs for clarification. *See Cruz*,

4

2010-NMCA-011, ¶ 31 (discussing *State v. Platt*, 114 N.M. 721, 722-23, 845 P.2d 815, 816-17 (Ct. App. 1992); *Davis*, 26 N.M. at 525, 194 P. at 882; *State v. Tanner*, 22 N.M. 493, 495, 164 P. 821, 822 (1917)).  The Court of Appeals cited to *Platt*, *Davis*, and *Tanner*, concluding that "[i]t is well established that a check given in payment for an antecedent or pre-existing debt is not covered by the . . . Act." *Cruz*, 2010-NMCA-011, ¶ 31.  The Court of Appeals was not wrong in terms of its reading of history.

**{15}**    However, the Court of Appeals was not asked to consider, and it did not consider, whether the 1963 repeal of the Act and its replacement with a substantially different statute might affect the persuasive authority of such distant precedent.  The Court of Appeals validated its reasoning by looking to case law from other states, interpreting other statutes. *See Cruz*, 2010-NMCA-011, ¶¶ 34-37.  Because the confusion, at least initially, lies in our own case law, it falls on this Court to address the matter squarely.

**{16}**    To understand our early precedent, it is helpful to recall that when the crime of issuing worthless checks was first enacted, *see* NMSA 1915, § 1560 (1907), it was intended to supplement existing crimes that were familiar to the courts of the time.  *See Bad Check Laws*, 44 Harv. L. Rev. 451, 451 (1931) ("In [that] era of expanding credit and the widespread use of checks as a substitute for currency, it [was] necessary to have some effective legal deterrent for the issuance of checks drawn without funds." (footnote omitted)).  Existing common-law crimes, such as "cheating," had been thought too narrow because they often focused on the manner in which the bad check was used (e.g., to obtain property falsely) and not on the issuance of the worthless check itself.  *See id.* at 451-52 ("The common law crime of cheating ha[d] never been deemed broad enough to embrace this evil.  Under the early English statute making it a crime to obtain property by false pretenses, however, such [a check issued without sufficient funds] was sometimes regarded as a form of false pretense, and it's [sic] issuance indictable." (footnotes omitted)).  In other words, over time and with the growing use of checks in commerce, the evil had become the issuance of a check without sufficient funds, regardless of how property might have been obtained by virtue of that check.  *See id.* at 452-53.  Therefore, specific statutes were created to address the problem of bad checks.  *See id.* at 453.

**{17}**    New Mexico seems to have followed the national trend.  The first version of the Act appeared in New Mexico statutes alongside crimes such as "Cheating and false pretenses" and "Cheating and false representations" in the "Cheats—Frauds—False Pretenses" article. *See generally* NMSA 1915, §§ 1551 to -72 (1854, as amended through 1909).[1]  Notably, the

---

[1] "**Cheats and false pretenses**" required that a person

> designedly, by any false pretense, or by any privy or false token, and with intent to defraud, obtain from any other person any money or goods, wares, merchandise or other property, or shall obtain with such intent the signature of any

cheating crimes required that a person obtain or attempt to obtain property, or a forgery in the case of "Cheats and false pretenses," through the use of some form of trickery or deception. *See* §§ 1551 to -53 (emphasis omitted). In addition, "Cheating and false representation" could be accomplished by *obtaining property through the use of a check*. In comparison, the original Act required that a person "wilfully or with intent to defraud draw or utter any order or check or other instrument, for moneys, on any bank . . . knowing that such order or check or other instrument will not be paid or honored upon presentation thereof." *See* § 1560 (1907). Unlike the cheats crimes, the original Act did not explicitly require that things of value be *obtained* by use of a check; nor did it make any reference to false pretense. *Id.* Instead, the original Act concentrated more on the issuer's state of mind when the check issued, regardless of the manner in which the check was used.

**{18}** *Tanner,* written in 1917, is the only case from this Court to mention the original version of the Act. 22 N.M. at 495, 164 P.822. Although the Court of Appeals cites *Tanner* to support the existence of a pre-existing debt rule, *see Cruz,* 2010-NMCA-011, ¶ 31, on closer scrutiny we cannot agree. *Tanner* only mentions the original Act in passing, stating that the Act and the earlier mentioned cheating crimes were all properly indicted. *Tanner,* 22 N.M. at 495, 164 P. at 822 ("There are three sections of the Code of 1915, which are applicable to the facts of the case, . . . [Sections] 1551, 1553, and 1560."). The Court's legal inquiry in *Tanner,* however, was whether the facts alleged in the indictment—a worthless check in return for the delivery of cattle—were sufficient to show *false pretenses.* The crimes "Cheats and false pretenses" and "Cheats and false representations" each mention "*false pretenses,*" explicitly as a violation of those crimes. See *id.* at 495 n.1, 164 P. at 822 n.1. The original Act did not. While it is possible that the justices on the *Tanner* Court also thought false pretenses was an element of the original Act, *Tanner* does not actually say that.

---

> person to any written instrument, the false making whereof would be punishable as forgery . . .

Section 1551 (1897).

> "**Cheats and false representations**" required that a person

>> with intent to cheat and defraud, shall obtain, or attempt to obtain, from any other person or persons any money property or valuable thing whatever by means or by use of any trick or deception or false or fraudulent representation or statement or pretense, or by any other means or instrument or device commonly called the "confidence game," or by means or by use of any false or bogus check, or by any other printed, written or engraved instrument or spurious coin or metal.

Section 1553 (1897).

In our judgment, therefore, *Tanner* is a weak reed upon which the Court of Appeals relied for the proposition that the modern Act requires false pretenses in obtaining property and does not apply to pre-existing debts. The *Tanner* opinion is simply not clear.

{19}    During this same "era of expanding credit and the widespread use of checks as a substitute for currency," *Bad Check Laws*, *supra*, at 451, other jurisdictions began to recognize the essential difference between worthless check acts and other common-law crimes. For example, the Arizona Supreme Court stated in 1926:

> While the courts generally hold that one who obtains property upon a credit agreement and later gives a bogus check in payment is not guilty of the crime of obtaining property by false pretenses because nothing in exchange for the check is obtained, the offense defined in [Arizona's Bad Check Act] is a new and distinct one, and to be guilty of it it is not necessary that one obtain money or property at the time of passing the check.

*State v. Meeks*, 247 P. 1099, 1099-1100 (Ariz. 1926). The Ohio Supreme Court commented similarly:

> It was the evident purpose of this statute to prevent the negotiation of false checks drawn on accounts which did not exist, or were insufficient to pay the checks drawn. It was meant, for example, to protect hotelkeepers from receiving 'cold checks' in payment of obligations incurred for lodging, many of which are past due. It was enacted to protect business men all over the state, to protect commercial life; about 90 per cent. of the commercial work of the world being done on credit. In order to protect the credit intercourse of the community this statute was enacted creating a new crime and providing new and distinct rules of evidence.

*State v. Lowenstein*, 142 N.E. 897, 899 (Ohio 1924), *superceded by statute*, Passing Bad Checks, Ohio Rev. Code Ann. § 2913.11 (West 1986), *as stated in State v. Rudd*, 562 N.E.2d 955, 956-57 (Ohio Mun. Ct. 1988). These courts recognized that "the evils referred to are all quite distinct from those consequent on fraud, and the statute is to be regarded as creating a new and distinct offense." *State v. Avery*, 207 P. 838, 839 (Kan. 1922), *superceded by statute*, Kans. Stats. Ann. § 21-554 (1963), *as stated in State v. Beard*, 416 P.2d 783, 785 (Kan. 1966).

{20}    Unlike obtaining property by false pretenses,

> [t]he present statute is aimed at a practice which has become a menace to trade, an evil and a mischief in the field of commerce, where the major portion of business is done on paper. . . .[I]t is a crime, an injury to society, to undermine, in any degree, the very foundation upon which all credit rests.

*State v. Yarboro*, 140 S.E. 216, 220 (N.C. 1927) (Stacey, C.J., concurring). Admittedly, these cases do not interpret statutes requiring a check to be given "in exchange for a thing of value." They do, however, take into account the purposes behind these worthless checks statutes, which are similar to those stated in the modern Act.

**{21}**   Even though some courts, like those cited above, took notice of the purpose of bad-checks legislation, "[a] number of courts clung to the notion that there could be no intent to defraud unless something of value was *obtained* by the accused, and therefore a check given in payment of an antecedent obligation was held not within the scope of the ordinary bad check law." *Bad Check Laws*, *supra*, at 454 (emphasis added). For a time, at least initially, New Mexico seems to have followed the latter trend by "clinging to the notion" of "antecedent obligations."

**{22}**   *Davis*, decided in 1921, and the second case cited by our Court of Appeals for the pre-existing debt rule stands for just such a proposition. In that case, this Court concluded that the 1919 version of the Act did not apply to a buyer who obtained goods on open account and later settled the existing account with a bad check. *Davis*, 26 N.M. at 524-25, 194 P. at 882. The then recently amended 1919 Act defined the crime as "attempted larceny" or "larceny," committed "if money or property is *obtained from another*" by use of a worthless check. *Compare* § 1560 (1907), *with* 1919 N.M. Laws, ch. 132, § 1 (emphasis added). Since the goods had already been "obtained" before the issuance of the check, this Court held that the Act did not apply because "there could be no . . . fraudulent intent." *Davis*, 26 N.M. at 525, 194 P. at 882 ("The question is whether or not it is a violation of the section of the statute quoted for one to issue a check in payment of an outstanding account, credit not being given on the strength of the checks so issued. Clearly it is not a violation of the statute, because . . . there [could] be no intent to defraud, which is the gist of the offense.").

**{23}**   *Davis* seems to have overlooked the 1919 Act's newly-added provision that appears to contradict this reasoning: "the making . . . of a check, . . . payment of which is refused by the drawee because of lack of funds or credit, shall be prima facie evidence of intent to defraud." 1919 N.M. Laws, ch. 132, § 1 (emphasis added). Whether or not correct at the time, however, *Davis* does stand for the proposition that the 1919 Act, with its particular language pertaining to obtaining property and an intent to defraud, does not cover worthless checks issued to pay antecedent obligations.

**{24}**   Significantly, our Legislature amended the 1919 Act soon thereafter to eliminate the language that money or property must be "*obtained* from another" by use of the fraudulent check. *Compare* 1919 N.M. Laws, ch. 126, § 1, *with* 1929 N.M. Laws, ch. 132, § 1. At the time, the 1929 amendment was characterized in a scholarly journal as part of a national trend, a "flurry of legislation definitely resolving the doubt in respect to checks given for antecedent obligations in favor of their inclusion within the statutory penalty." *Bad Check Laws*, *supra*, at 454 & n.20 (citing 1929 N.M. Laws, ch. 126, along with statutes from Indiana, Michigan, and Montana). Continuing along that same line of thought, "[t]he

Tentative Draft of the American Law Institute's Model Penal Code (1955), § 206.22, establish[ed] as a crime the issuance or passing of a check knowing that it will not be honored, regardless of whether or not property was thereby obtained." *State v. Goerdes*, 137 A.2d 100, 104 (N.J. Super. Ct. Law Div. 1957) (citing the Model Penal Code proposal in support of the proposition that false pretenses and issuing of a worthless check are distinct crimes).

**{25}** During the subsequent decades, New Mexico courts had no occasion to revisit *Davis,* and specifically the "notion" of the antecedent-debt exclusion, in light of the 1929 amendments to the Act, as well as changes thereafter. That lack of opportunity is unfortunate. Accordingly, *Davis* continues to stand as cited precedent for the antecedent-debt rule, despite material changes in the Act, reflecting notable changes in societal attitudes towards the crime of issuing worthless checks. Decades later, we now have such an opportunity.

**{26}** Continuing with our analysis of the evolution of the Act, in 1963 the Legislature replaced the Act in its entirety with what, for the most part, is the statute in its present form. *Compare* 1963 N.M. Laws, ch. 315, §§ 1-10, *with* §§ 30-36-1 to -10. As previously observed, the 1963 Act was the first to include the language at issue today, "in exchange for anything of value." *Compare* 1963 N.M. Laws, 315, §§ 1-10, *with* § 1560 (1907); 1919 N.M. Laws, ch. 132, § 1; 1929 N.M. Laws, ch. 126, § 1; 1937 N.M. Laws, ch. 142, §§ 1-5; 1953 N.M. Laws, ch. 132, § 1; 1959 N.M. Laws, ch.113, §§ 1-2; 1961 N.M. Laws, ch. 206, § 1. With the 1963 replacement, the Legislature continued the trend, begun in 1929, that the check need not be issued to "obtain[]" property. *Compare* 1919 N.M. Laws, ch. 132, *with* 1929 N.M. Laws, ch. 126, § 1, *and* 1963 N.M. Laws, ch. 315, §§ 1-10. Presumably, given these trends and the inclusion of a purpose statement that saying as much, our Legislature intended courts to focus on the evils of the worthless check itself and less on whether a check issued to pay for a present transaction or a pre-existing obligation.

**{27}** In 1992 the antecedent debt "notion" resurfaced in *Platt,* the only case to date that has construed the 1963 Act. *Platt*, 114 N.M. 722, 845 P.2d 816. In *Platt*, an owner, seeking to renovate his property for use as an inn, entered into a contract for the purchase and installation of carpeting and drapes. *Id.* at 722, 845 P.2d at 816. The owner paid for those goods and services by a series of checks, some of them worthless, having been issued after the goods were delivered and installed, and some of them in payment of previous checks that had been returned for insufficient funds. *Id.*

**{28}** Like the open account in *Davis*, the owner argued that his check had issued to pay for a pre-existing debt—the installations already performed and the goods already delivered. *Platt*, 114 N.M. at 722, 845 P.2d at 816. Correctly, our Court of Appeals rejected that argument and instead "read *Davis* as limited to its facts." *Platt* at 723, 845 P.2d at 817. Based on this reading, the *Platt* court determined that the pre-existing debt exception would only apply to "situations in which something of value has previously been delivered to a person in reliance on that person's credit, and the check is later tendered as partial payment

9

on the credit account." *Id.* In other words, the kind of open account litigated in *Davis*.

**{29}** According to *Platt*, the modern Act does apply to transactions in which goods and services are delivered before the issuance of a check, if a creditor/debtor relationship was not contemplated and the "parties intended to have a cash transaction." 114 N.M. at 723, 845 P.2d at 817. Because the parties in *Platt* "intended to have a cash transaction," and there was "no evidence that [the contractors] intended to extend credit to defendant," then "the fact that the goods and services were delivered before the check was issued did not signify that an exchange did not occur within the meaning of Section 30-36-4." *Platt*, 114 N.M. at 723, 845 P.2d at 817.

**{30}** Up to that point, we have no dispute with *Platt*. However, despite *Platt*'s newly functional approach and its purported limitation of *Davis*, the Court of Appeals then proceeded to limit the Act's application to a "contemporaneous transaction." Based on the timing of the exchange, "a worthless check is given for something of value if the worthless check is issued as part of a contemporaneous transaction." *Platt*, 114 N.M. at 723, 845 P.2d at 817. In other words, if the worthless check is not part of a contemporaneous transaction, then presumably it would be in payment of an antecedent debt and the modern Act would not apply. Though seemingly circular in its analysis, it is *Platt*'s condition of contemporaneousness that caught the eye of the Court of Appeals in the present case.

**{31}** Applying *Platt* to this case, the Court of Appeals asked whether a "payment of wages earned is payment of a pre-existing debt" or a "contemporaneous transaction." *Cruz*, 2010-NMCA-011, ¶¶ 32-33. The Court of Appeals distinguished this case from *Platt* on the basis that, in *Platt*, "the recipients of the check sought payment on the very day they provided services," and that "there [was] nothing to suggest that the recipients ever agreed to a delay before being compensated for their work." *Cruz*, 2010-NMCA-011, ¶ 40. On the other hand, the workers "in this case worked for a week with the expectation that they would have to wait another week before being paid for their labor." *Id.* In other words, according to the Court of Appeals, the workers became creditors of their employer, in effect loaning the employer their wages for the week it took to deliver their payroll checks. Having previously "read *Davis* as limited to its facts," *Platt*, 114 N.M. at 723, 845 P.2d at 817, the Court of Appeals now, in effect, exhumed it. And along with it, came the discredited exception of an antecedent or pre-existing debt.

**The Amended Act Evidences Legislative Intent to Change the Act's Application**

**{32}** Although *Platt* was on the right track in limiting *Davis* "to its facts," it failed to appreciate that, after *Davis,* the Act was amended or replaced nine times. *Platt*, 114 N.M. 722-23, 845 P.2d 816-17 (failing to consider, for example, changes made in 1929 N.M. Laws, ch. 126, § 1; 1963 N.M. Laws, ch. 315, §§ 1-10; and 1979 N.M. Laws, ch. 8, §§ 1-2). Section 4 of the 1963 Act made it a crime, for the first time, to issue a check "in exchange for anything of value, with intent to defraud"—the essence of the crime still today. *Compare* 1963 N.M. Laws, ch. 315, § 4, *with* § 30-36-4. It also defined "thing of value" in the way

it is still defined today: "money, property, services, goods and wares and lodging." *Compare* 1963 N.M. Laws, ch. 315, § 2, *with* § 30-36-2. The existing purpose statement was also first added in 1963. *See* § 30-36-3.

**{33}** These changes, along with those made in 1929, discussed earlier, indicate a legislative intent to alter the Act's application. *See Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 36, 147 N.M. 583, 227 P.3d 73 ("In our statutory construction, we must give effect to those changes. 'This Court has long held that we must avoid constructions of statutory amendments that would render the change unnecessary and meaningless.'" (quoting *State v. Nick R.*, 2009-NMSC-050, ¶ 28, 147 N.M. 182, 218 P.3d 868)). Although *Platt* read a "contemporaneous transaction" into the Act, the modern Act does not indicate that the Legislature contemplated a "contemporaneous exchange" or any other specialized meaning of "exchange." *See* § 30-36-4. As previously noted, the word "contemporaneous" does not appear in the text of the modern Act.

**{34}** The Legislature's inclusion of "services" in the definition of "thing of value," also indicates that "exchange" should not be limited to "contemporaneous exchange." That the definition of "thing of value" specifically includes "services," "property," and "lodging" indicates that the modern Act should apply even when contemporaneous exchanges are not possible, expected, or typical. For example, it is not uncommon for employers to pay wages by check with a week's delay. It is not uncommon for tenants to use checks to pay their rent for the coming month. Vacationers commonly pay well in advance for lodging to reserve a space (for example, on a cruise or for vacation rental). The Act gives no indication that such transactions should be excluded. Such checks are unquestionably "given in return for" services, property, or lodging, whether or not the transaction can be described as contemporaneous.

**{35}** If an exchange need not be contemporaneous, then what strictures exist to limit coverage under the Act? Simply put, as selected by our Legislature, there must be an exchange, a *quid pro quo* of some kind, involving "anything of value." The Act would appear not to apply, for instance, to checks given gratuitously, such as charitable donations. Beyond that, although we do not here decide questions not directly presented to us, the Act would appear to apply. Our Legislature appears to have decided, as a matter of public policy, that it is more important to punish and deter the issuance of worthless checks than whether goods and services were provided contemporaneously with that check. We will enforce that policy choice.

**Other States**

**{36}** We recognize that other states have adopted a contemporaneous transaction test. *See Platt,* 114 N.M. at 723, 845 P.2d at 817 (listing cases in support of its adoption of the contemporaneous transaction rule and its reading of *Davis* that the Act excludes "situations in which something of value has previously been delivered to a person in reliance on that person's credit, and the check is later tendered as partial payment on the credit account").

11

We note, however, that in each of the cases cited in *Platt* and *Cruz*, the statute in question is materially different from our modern Act. *See Ledford v. State*, 362 S.E.2d 133, 133-34 (Ga. Ct. App. 1987) (per curiam) (requiring a contemporaneous exchange for the Georgia Act to apply when the statute in question called for the issuance of the check to be "in exchange for a *present consideration or wages*," rather than "in exchange for something of value" (emphasis added) (internal quotation marks and citation omitted)); *Parker v. State*, 484 So. 2d 1033, 1036 (Miss. 1986) (requiring the recipient of a check to have relied upon the issued check itself for the Mississippi statute to apply, when the Mississippi statute was called "*false pretenses* by delivery of a bad check" (emphasis added)); *Hoyt v. Hoffman*, 416 P.2d 232, 233 (Nev. 1966) (requiring the maker of a check to receive a benefit "as a result of" a check's delivery in order to apply the Nevada act, but also asserting that the purpose of the statute in question was "to charge a defendant who obtains a benefit as a result of the check" and that "[t]he legislature did not intend to make it a crime to issue a worthless check absent damage or injury to the payee thereof"). Unlike the Georgia, Mississippi, and Nevada statutes, our Act does not require an exchange for present consideration, it has never mentioned false pretenses, and it does not require that anything happen "as a result" of a check's delivery. *See* §§ 30-36-1 to -10.

**{37}** The Court of Appeals also cited *State v. Sinclair*, 337 A.2d 703, 707-11 (Md. 1975); *State v. Cote*, 594 N.E.2d 198, 199 (Ohio Mun. Ct. 1991); and *Hindman v. State*, 378 So. 2d 663, 664 (Miss. 1980). *Cruz*, 2010-NMCA-011, ¶ 36. Upon close examination, however, none of these cases consider statutes that include the provisions of the Act we find determinative today, which include "exchange for anything of value," "thing of value" defined to include "services," and an explicit purpose statement to reduce harm to the banking system. Each case makes reference to "obtain[ing]" things of value through the use of a check. *See Sinclair*, 337 A.2d at 706-07 (interpreting a Maryland statute that required that "money, credit, goods, wares or anything of value" are *obtained* by means of a check and had previously been considered a form of false pretenses, did not mention of services, and provided that there was "'presumptive evidence of such intent to cheat and defraud' only where there ha[d] not been a return or tender of the return of the 'thing so obtained,'" and it is impossible to "return" services); *Cote*, 594 N.E.2d at 203-04 (interpreting an Ohio statute that defined defraud as "'knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another'"); *Hindman*, 378 So. 2d at 664-65 (interpreting a statute that not only required that a check be used to *obtain* money, or articles of value or services, but also specifically codifying that "past due" accounts were excluded).

**{38}** Not only do the cases cited in *Cruz* apply significantly different statutes, but they apply those statutes in a manner similar to the common-law prohibition against *false pretenses*. *Compare State v. Rochette*, 594 A.2d 1006, 1010 (Conn. App. Ct. 1991) ("To be found guilty of [obtaining property by false pretenses], a person, therefore, must knowingly make a false representation with the intent to defraud, and that false representation must induce action that effectively causes the accused to receive something of value without compensation."), *with Hindman*, 378 So. 2d at 665 ("[R]eliance upon the check must have

12

been the efficient inducement which moved the party receiving it to part with something of value, including valuable services, relying upon its validity."). As previously discussed, the purpose of our Act and our general history of worthless check legislation do not support such a reading.

**{39}** For the foregoing reasons, we hold that the antecedent or pre-existing debt exception no longer applies to criminal prosecutions under the Act, including the State's case against Defendant herein. We also reject the requirement of a contemporaneous transaction as set forth in *Platt.* The language of the Act requiring "an exchange for anything of value" is to be read broadly, according to its terms, in conjunction with the rest of the Act, and in light of the history, purpose, and context of the Act as set forth in this opinion.

**CONCLUSION**

**{40}** We reverse the Court of Appeals and remand for consideration of the remaining issues raised, but not decided, before the Court of Appeals.

**{41}** **IT IS SO ORDERED**.

_____
**RICHARD C. BOSSON, Justice**


**WE CONCUR:**


_____
**CHARLES W. DANIELS, Chief Justice**


_____
**PATRICIO M. SERNA, Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Cruz*, Docket No. 32,130**

| **CM** | **COMMERCIAL LAW** |
| --- | --- |
| CM-CM | Commercial Law, General |
| CM-FU | Fraud |
| CM-OA | Open Account |
| CM-VP | Vendors and Purchasers |

**CL**     **CRIMINAL LAW**
CL-FE      Felony
CL-FR     Fraud
CL-WC     Worthless Checks Offenses

**PR**     **PROPERTY**
PR-PN     Promissory Notes

**ST**     **STATUTES**
ST-AP     Applicability
ST-IP     Interpretation
ST-LI     Legislative Intent
ST-RC     Rules of Construction
St-SG     Statutes, General